ESTATE OF LELIA E. COULTER, DECEASED, JOEL WRIGHT COULTER, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3821. Promulgated December 5, 1946.

*A. Calder Mackay, Esq.*, and *Adam Y. Bennion, Esq.*, for the petitioner.

*E. A. Tonjes, Esq.*, for the respondent.

TURNER, *Judge*: The respondent determined an estate tax deficiency of $60,220.62. The issues presented are (1) whether the respondent erred in determining that a certain transfer of property made by decedent in 1920 as one of four grantors of a trust was made

in contemplation of death or was intended to take effect in possession or enjoyment at or after death, within the meaning of section 811 (c) and (d) of the Internal Revenue Code, and accordingly should be included in decedent's gross estate, and (2) whether the respondent erred in determining the value of certain shares of corporate stocks contained in the transfer.

### FINDINGS OF FACT.

Joel Wright Coulter is the executor, within the meaning of section 930 of the Internal Revenue Code, of the estate of Lelia E. Coulter, deceased, who died testate on March 22, 1942, a resident of Los Angeles, California. The return for the estate was filed with the collector of internal revenue for the sixth district of California, at Los Angeles.

### ISSUE I.—*Inclusion of Transferred Property in Decedent's Gross Estate.*

### FINDINGS OF FACT.

The decedent's husband, Frank M. Coulter, died in October 1915. His father, B. F. Coulter, had died in 1911, bequeathing to him 249⅔ shares of stock in Coulter Dry Goods Co., sometimes hereinafter referred to as Dry Goods; 249⅔ shares of stock in B. F. Coulter Association, sometimes hereinafter referred to as Association; $27,300 face value of Government bonds; and a small amount of cash. The estate of B. F. Coulter was still in the process of administration when Frank M. Coulter died in 1915. In addition to the assets bequeathed to him by his father, Frank M. Coulter's estate owned 750 shares of stock in Dry Goods and 750 shares of stock in Association. Final distribution of Frank M. Coulter's estate was made on or about October 19, 1920, including his interest in the then undistributed estate of his father, which in turn was distributed on or about November 21, 1921.

By his will Frank M. Coulter bequeathed outright to his widow, Lelia E. Coulter, the decedent herein, one-half of his estate. The other one-half he bequeathed to her during her widowhood, with remainder over, upon her remarriage or death, to their three children, Mary I. Posey, Lelia A. Seeley, and Joel Wright Coulter, in equal shares.

Under date of September 29, 1920, and prior to the distribution of the estates of Frank M. Coulter and B. F. Coulter, the decedent and her 3 children, as trustors, transferred to Title Insurance & Trust Co., of Los Angeles, as trustee, all of their right and interest as heirs, legatees, devisees, or successors of Frank M. Coulter, or otherwise, in and

to the 750 shares of stock in Dry Goods and 750 shares of stock in Association in the estate of Frank M. Coulter, together with their interest in and to the estate of B. F. Coulter. Five hundred shares of the foregoing 750 shares of stock in Dry Goods and 500 shares of the 750 shares of stock in Association were at that time subject to and pledged as collateral for an indebtedness of $86,344.59 to the First National Bank of Los Angeles which was created by Frank M. Coulter prior to his death.

In connection with the foregoing transfers, the four trustors and the trustee executed a declaration of trust dated October 1, 1920.

By paragraph II of the trust instrument the trustee was given broad powers of management, including the right to buy from and sell to the trust, as well as to loan money to it. The trustee was vested with sole discretion and power to determine what should constitute principal of the trust estate, gross income therefrom, and net income available for payment under the terms of the trust. Paragraph III related to the payment of expenses, taxes, etc., arising from the operation of the trust, together with fees payable to the trustee. The instrument further provided:

### IV.

Out of the net income derived from the trust estate and available for distribution hereunder there shall be paid to said Lelia E. Coulter the sum of $200.00 per month and such further sums as the Trustee may in its absolute discretion determine to be adequate or necessary for her proper support, care and maintenance. The remainder of the entire net income derived from the trust estate and available for distribution hereunder shall be applied to the payment of the principal and interest upon the indebtedness * * * [of $86,344.59 created by Frank M. Coulter], excepting such part or portion thereof as should in the absolute and uncontrolled discretion of the Trustee be retained for the safety and protection of the trust estate. Upon and after the payment of said indebtedness, the entire net income from the trust estate up to and including but not exceeding the sum of Twelve Thousand Dollars ($12,000.00) per annum, and available for distribution hereunder, shall be paid monthly to said Lelia E. Coulter and all of said net income, exceeding said sum of Twelve Thousand Dollars ($12,000.00) per annum, and available for distribution hereunder, shall be paid quarterly in equal shares to each of said Trustors, Joel Wright Coulter, Mary Isabelle Posey and Lelia Alice Seeley.

### V.

It is a further express provision of this trust that if said Trustee, in its absolute and uncontrolled discretion, should deem that the net income distributed from the trust estate should not be sufficient to provide for the reasonable needs and comforts of said Lelia E. Coulter, during any period or periods of her illness or other want or necessity, it may and.is hereby authorized and empowered, and as often as it shall deem necessary or advisable, pay to or use, apply or expend for the use and benefit of said Lelia E. Coulter such portions of the principal of the trust estate, up to and including the whole thereof, as said Trustee, in its absolute discretion, may determine to be adequate for said Lelia E. Coulter during such period or periods. The receipt of said Lelia E. Coulter shall be a

full release and acquittance to the Trustee for the proper application of any part of the principal distributed to her. If the Trustee shall use, apply or expend any portion of the principal of the trust estate for the use and benefit of said Lelia E. Coulter its services in this respect shall be regarded as extraordinary services for which the Trustee shall be entitled to additional compensation as hereinbefore provided.

A provision similar to that contained in paragraph V was contained in paragraph VI, authorizing the invasion of corpus in behalf of the three children-trustors, in the absolute and uncontrolled discretion of the trustee, with the limitation that not more than one-third of the entire corpus could be paid in this manner to or for the use of any one of these three trustors. Amounts so paid were to be treated as advancements in determining their respective shares upon termination of the trust. Interest at the rate of 4 per cent per annum upon amounts so paid to or for any one of the three trustors was to be deducted from the annual net income distributable to such trustor and paid to the others. Paragraph VII provided for the transfer of additional property to the trust by the four trustors. In paragraph VIII the trustee agreed to secure renewal from time to time, for a period of five years, of the loan represented by the above mentioned indebtedness of $86,344.59, or to refinance the loan from other sources for such period, or at its option to carry the loan itself.

Paragraph IX provided that, unless sooner terminated under the power of revocation reserved by the trustors, the trust should terminate upon the death of the decedent herein and that the corpus and undistributed income should be distributed to the three children-trustors in equal shares, subject to the provisions of paragraph VI, *supra.* In event of the death of either of the three children-trustors prior to the termination of the trust, his or her share was to go to the devisees or legatees named in his or her last will, or, in the absence of a will, to his or her heirs at law, according to the laws of California then in force. Under paragraph X, if any of the three children-trustors should die during the life of the trust, the income to which he or she would have been entitled was to be distributed to the heirs, legatees, or devisees named in his or her will, or, in the absence of a will, to his or her heirs at law, according to the laws of California then in force.

Paragraph XI contained the following:

### XI.

It is a further provision of this trust that said Trustors, or in the event of the death of any or either of said Trustors, then the survivors or survivor of said Trustors, have reserved, and said Trustee does hereby assent to the express right and power reserved unto said Trustors, to revoke in whole or in part this trust, at any time, by notice of revocation in writing, addressed and delivered to said Trustee at least ninety (90) days prior to the taking effect of such revocation.

\* \* \* In the event this trust is revoked in whole or in part by said Trustors under this paragraph prior to the death of said Lelia E. Coulter, then the trust estate, together with all accrued net income thereon, to be distributed on account of such revocation shall be distributed to said Joel Wright Coulter, Mary Isabelle Posey and Lelia Alice Seeley in equal shares, subject to the provisions of paragraph 6 hereof, provided that in the event of the death of either of them prior to such revocation of this trust then the interest which he or she would have taken if he or she had survived such revocation of this trust shall go to and be distributed to the devisees or legatees named in his or her last will and testament, or in the absence of any such will or testament, then to his or her heirs at law, according to the laws of the State of California then in force.

In October 1940 the trust instrument was amended in certain particulars which are not material here.

At the time the trust was created in 1920 the decedent was 65 years of age and was healthy, active, and in good spirits. She was executrix of her husband's estate, but had had no business experience. Her daughters also were without business experience. Her son, Joel Wright Coulter, was and had been a farmer, residing away from Los Angeles. In this situation and in view of the fact that a considerable amount was owing by the estate of decedent's husband, for which certain shares of stock in Dry Goods and in Association had been pledged, it was thought by the decedent and her children that upon the creation of a trust, under the management of Title Insurance & Trust Co., with a provision for the application of most of the trust income to the payment of the indebtedness, the holder of the indebtedness would not foreclose on such shares of stock as were pledged as collateral. Further, the decedent and her children desired to be relieved of the management of the property composing the trust estate. They believed that the Title Insurance & Trust Co. could handle the property more efficiently than they could and that they would be better off financially by having it do so. Apart from her interest in the property transferred to the trust, the decedent had other property substantial in amount which she retained, including securities of an approximate value of $10,000 and a 12-room house located upon a lot which she sold a few years later, after the house had been removed therefrom, for $75,000.

The indebtedness to the First National Bank of Los Angeles mentioned above was paid off by the trust during 1920 with the proceeds of a loan by the trustee, Title Insurance & Trust Co., which latter loan was in turn paid by 1925, principally out of trust income, in accordance with the terms of the trust instrument. From October 1, 1920, through the calendar year 1941, the total income of the trust amounted to $430,271.45, composed of the following: Dividends on stock in Dry Goods, $317,528.93, and on stock in Association, $112,643.41, and miscellaneous income, $99.11. From such income there was paid the following: Interest on the loan, $20,519.96; trust charges, $33,774.64;

and taxes and miscellaneous expenses, $2,351.89, or a total of $56,-646.49. This left net distributable income of $373,624.96. Of that amount, $199,453.81 was distributed to the decedent and $118,312.76 was distributed among the three children-trustors.

No part of the trust corpus was ever paid to any of the four trustors, nor was the trust ever revoked in whole or in part prior to the decedent's death.

The decedent's son was born in 1886 and his wife was born in 1885. They have a daughter, born in 1912, and a son, born in 1915. Their daughter has a daughter, born in 1942. The decedent's older daughter, Mary Isabelle Posey, was born in 1882. Her husband was born in 1880. They married in 1904, and two children were born to them, one who died in 1915 and a daughter, born in 1905. The latter married during 1928 and has two daughters, one born in 1931 and the other in 1933. The decedent's other daughter, Lelia Alice Seeley, was born in 1893, and married in 1913. She has three daughters, born in 1914, 1916, and 1926, respectively. She has two grandchildren, born in 1943 and 1944, respectively. The decedent was survived by her three children, their spouses, and their children, with the exception of the deceased child of Mary Isabelle Posey, mentioned above.

Each of the decedent's three children, at all times since prior to 1920, has had a will under which his or her estate is to be distributed to his or her spouse and children.

In determining the deficiency involved herein, the respondent determined that the transfer made to trust by the decedent in 1920 was made in contemplation of death and intended to take effect in possession or enjoyment at death within the provisions of section 811 (c) and (d) of the Internal Revenue Code, and accordingly included in decedent's gross estate the amount of $253,195.12, computed as follows:

| | |
|---|---|
| Cash | $6,902.73 |
| 1,000 shares Coulter Dry Goods Co. at $350 | 350,000.00 |
| 999⅔ shares B. F. Coulter Assn. at $150 | 149,950.00 |
| Total | 506,852.73 |
| Less: Trustee's fees accrued at date of death | 462.50 |
| Net Value of total corpus | 506,390.23 |
| Decedent's 50% thereof | 253,195.12 |

The transfer to trust made by decedent in 1920 was not made in contemplation of death.

### OPINION.

By his will the decedent's husband left outright one-half of his estate to her and the other one-half to her during her widowhood,

with remainders over, upon her remarriage or death, to their three children. In 1920 she transferred to trust all of her interest in each one-half. The respondent has included no amount in her gross estate with respect to the one-half left to her during her widowhood and makes no claim that any amount should be included with respect thereto. The controversy here relates only to the respondent's action in including in her gross estate the value, at the time of her death, of the one-half interest in her husband's estate which was left outright to her.

Since the interest in controversy was transferred to trust prior to March 3, 1931, the respondent does not contend that its value is includible in the decedent's gross estate on the ground that she retained an interest in the trust income. However, he contends that the value of such interest is includible in the gross estate because the transfer was of the character required to be included by the provisions of section 811 (c) and (d) of the Internal Revenue Code, which is set out in the margin.[1]

---

[1] SEC. 811. GROSS ESTATE.

The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States—

(a) DECEDENT'S INTEREST.—To the extent of the interest therein of the decedent at the time of his death ;

\*     \*     \*     \*     \*     \*     \*

(c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT DEATH.—To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom ; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter ;

(d) REVOCABLE TRANSFERS.—

(1) TRANSFERS AFTER JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death ;

(2) TRANSFERS ON OR PRIOR TO JUNE 22, 1936.—To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke, or where the decedent relinquished any such power in contemplation of his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Except in the case of transfers made after June 22, 1936, no interest of the decedent of which he has made a transfer shall be included in the gross estate under paragraph (1) unless it is includible under this paragraph.

Since the transfer was made by the decedent at a time long prior to her death, while she was in good health and for the purpose of being relieved of the management of the property which she was seeking to conserve by facilitating the discharge of an existing obligation thereon, we have found as a fact that the transfer was not made in contemplation of death.

As another ground in support of his position, the respondent contends that by the terms of the trust instrument the decedent retained the right to have the trustee invade corpus for her benefit and that this was sufficient to constitute the transfer one intended to take effect in possession or enjoyment at or after her death, within the meaning of section 811 (c). Pointing to the use in paragraph V of the trust instrument of the terms "in its absolute and uncontrolled discretion" and "in its absolute discretion," the petitioner contends that the trustee's discretion to invade corpus for the benefit of the decedent was absolute and uncontrolled, or, in other words, without condition or limitation, that under the statute and decisions of California she could have obtained relief from the trustee's failure to invade only by showing that the trustee had acted fraudulently or in bad faith, and that to include the transfer in the decedent's estate under these circumstances would be basing the inclusion on the possibility that the trustee would commit a crime. In support of its contention, the petitioner relies on section 2269 of the California Civil Code, which reads as follows:

Discretionary powers. A discretionary power conferred upon a trustee is presumed not to be left to his arbitrary discretion, but may be controlled by the proper court if not reasonably exercised, unless an absolute discretion is clearly conferred by the declaration of trust.

In addition, the petitioner relies on the decisions in *Neel* v. *Barnard*, 24 Cal. (2d) 406; 150 Pac. (2d) 177; and *Murphy* v. *Union Trust Co.*, 5 Cal. App. 146; 89 Pac. 988.

In *Neel* v. *Barnard*, *supra*, the grantors, as a means of refinancing their debts or otherwise saving themselves from the complete loss of their property which was then impending, transferred heavily encumbered farm lands to a trustee, to whom a large part of the encumbrances were owing, and authorized the trustee to sell the lands in such parcels, for such prices, and on such terms and conditions as the trustee, in its absolute discretion, might deem proper, and to apply the proceeds to the payment of the indebtedness of the grantors. At the time of the transfer the land market was inactive and thereafter continued so, with land values declining. In a suit to recover damages from the trustee for failure, among other things, to accept an offer made immediately following the transfer, to purchase certain parcels at prices that were higher than subsequently obtainable, it was held that the trustee's action was not reviewable, since he acted in good

faith and there was no showing that the grantors had urged the trustee to close the properties out at the best prices obtainable. In *Murphy* v. *Union Trust Co., supra,* a specified sum of money was given in trust for investment in improved real estate or other named types of property with liberty to the trustee to change the investment or investments at its discretion for any other of the named types of property. All or a portion of the trust funds was invested in real estate and an offer was made to the trustee to purchase the real estate at a stated sum. The beneficiaries brought suit against the trustee, advising the court of the offer and requesting an order directing the trustee to sell the real estate for the amount of the offer or for such other sum as might be obtained therefor, subject to confirmation by the court. Since the trust instrument vested in the trustee absolute discretion to dispose of trust property without referring a proposed sale to the court for its judgment as to whether the sale should be made and there was no express requirement in the law of California that sales of trust property by a trustee be confirmed by a court, it was held that the court was without jurisdiction to issue the order sought by the beneficiaries of the trust.

The factual situation in the *Neel* and *Murphy* cases is so radically different from that presented in the instant case as to render them without determinative effect here. Furthermore, the ruling in those cases merely preserved the discretion expressly granted to the trustees as to the when and how of accomplishing a trust purpose and was in no way a holding that the trustee had any discretion to refuse to carry out that purpose.

By the terms of paragraph IV of the trust instrument involved in the instant case the decedent was entitled to receive a distribution of a specified amount of income annually from the trust, during her life, and the remainder of the trust income was distributable to the three children trustors in equal shares. Paragraph V of the instrument provided as "a further express provision of this trust" that if the trustee, in its absolute and uncontrolled discretion, deemed that the income distributable to decedent from the trust should not be sufficient to provide for her reasonable needs and comforts during any period or periods of her illness or other want or necessity, the trustee was authorized to pay to the decedent or expend for her use and benefit such portions of the principal of the trust, up to and including the whole thereof, as it, in its absolute discretion, might determine to be adequate for her during such period or periods. It was also provided that if the trustee used or expended any portion of the principal of the trust for the use and benefit of the decedent, its services in that respect should be regarded as extraordinary services, for which it should be entitled to additional compensation as

provided in the trust instrument. A provision similar to that contained in paragraph V was contained in paragraph VI, authorizing the invasion of corpus in behalf of the three children-trustors, in the absolute and uncontrolled discretion of the trustee, with the limitation that not more than one-third of the entire corpus could be paid in this manner to or for the use of any one of the three children-trustors. Obviously the provisions respecting invasion of corpus, including those setting forth in detail the circumstances under which, and the extent to which, it could be invaded, and constituting so substantial a portion of the trust instrument, were inserted for a purpose. As pointed out in *Estate of John J. Toeller*, 6 T. C. 832, 838, the use in a trust instrument of such words as "absolute," "uncontrolled," or "sole discretion" does not mean that the discretion of the trustee is unlimited, where external standards are provided in the instrument for the guidance of the trustee in the exercise of his discretion. While the use of such words may enlarge the limits of the trustee's discretion, the provision of external standards for the trustee's action imposes a limit to the extent of his discretion. The standards provided with respect to the decedent in the instant case were to be invasions adequate to provide for her reasonable needs and comforts during illness or other want or necessity up to the full extent of the trust corpus, where annual distributions of income to her were insufficient. To conclude, as the petitioner contends, that the trustee's discretion to invade or not in the circumstances named was unlimited and was uncontrolled would be to render meaningless the two paragraphs of the instrument relating to invasion. In the situation here presented, it is apparent that the trust instrument contemplated that the trustee should and would invade corpus for the purposes provided for therein. Its failure to invade as contemplated would, under the provisions of section 2269 of the California Civil Code, *supra*, render its action subject to court control.

By retaining the right to have corpus used for her benefit, the decedent postponed the complete and ultimate transfer of the property until her death. This was enough to bring the property within the provisions of section 811 (c) of the Internal Revenue Code. *Blunt v. Kelly*, 131 Fed. (2d) 632; Margaret P. Gallois, 4 T. C. 840; affd., 152 Fed. (2d) 81; *Estate of Ida Rosenwasser*, 5 T. C. 1043; *Estate of John J. Toeller, supra.* The Circuit Court of Appeals for the Second Circuit, in *Commissioner* v. *Irving Trust Co.*, 147 Fed. (2d) 946, affirming *Hugh M. Beugler Trust*, 2 T. C. 1052, pointed out the distinction between those cases where the trustee's discretion is controlled by an external standard which a court could apply in compelling compliance, as in the situation here, and those cases where no such external standard was provided. We sustain the respondent's contention on

this point and hold that the value of the property in controversy is properly includible in the decedent's gross estate.

The respondent contends that under the trust instrument the decedent retained the power, in conjunction with the three children-trustors, to revoke the trust and thus change the enjoyment of the trust property, thereby bringing the transfer within the provisions of section 811 (d) (2) of the code. The petitioner contends that the decedent's power to revoke was insufficient to bring the transfer within the provisions of section 811 (d) (2).

Paragraph IX of the trust instrument provided that unless sooner terminated under the power of revocation reserved by the trustors, the trust should terminate upon the death of the decedent and the corpus and undistributed income should be distributed to the three children-trustors in equal shares, subject to the provisions of another paragraph not material here. By the terms of paragraph XI the decedent and the three children-trustors reserved the right to revoke the trust in whole or in part. In case of revocation, trust corpus was to be distributed in equal shares to the three children-trustors, or, if dead, to the devisees or legatees named in their respective wills, or, if no wills, then to their heirs at law. This was the same method of distribution provided for upon termination of the trust by the death of the decedent. Although devisees or legatees of heirs at law of the children-grantors had contingent remainder interests, the trust instrument conferred on them no right or power respecting revocation. If the trust had been revoked prior to the decedent's death, the interests of contingent remaindermen would have been cut off. The decedent would have received no income from corpus or any part thereof. She would have received no part of corpus, either outright or by being entitled to receive or have corpus expended in her behalf, in case of illness or other want or necessity. Revocation would have immediately vested in each of the three children-trustors one-third of the trust corpus free of the burden of possible invasion for the benefit of the decedent and free of the possibility that such portion would pass to their devisees or legatees or heirs at law. In other words, exercise of the power of revocation would have vested in the children-trustors free and untrammeled portions of corpus which they might never have received and which might have gone to others.

On first impression, the situation here might appear to resemble that in *Helvering* v. *Helmholz*, 296 U. S. 93, wherein it was held that the transfer there involved was not includible in the decedent's gross estate. As was pointed out in *Estate of Charles M. Thorp*, 7 T. C. 921, termination of the trust in the *Helmholz* case could be brought about by all the beneficiaries in the remainders who were living at the time of termination. In the instant case, participation

by devisees or legatees or heirs at law of a deceased child-grantor was not required to terminate, since this could be accomplished only by the decedent and the surviving children-grantors. There is also another difference which distinguishes this case from the *Helmholz* case. In that case the Supreme Court held that, under applicable Wisconsin law, termination of a trust by the beneficiaries living at the time of termination was legally possible. The law of California, which controls here, is otherwise. In California the rule is that a trust can be terminated by the consent of all the beneficiaries, *Eakle* v. *Ingram*, 142 Cal. 15; 75 Pac. 566; *Moor* v. *Vawter*, 84 Cal. App. 678; 258 Pac. 622. But where there are interests which can not be determined until the happening of a certain event, the consent of the living beneficiaries is not sufficient, *Fletcher* v. *Los Angeles Trust & Savings Bank*, 182 Cal. 177; 187 Pac. 425; *Hunt* v. *Lawton*, 76 Cal. App. 655; 245 Pac. 803; *Woestman* v. *Union Trust & Savings Bank of Pasadena*, 50 Cal. App. 604; 195 Pac. 944.

On brief, both parties recognize the similarity of the situation here to that involved in *Commissioner* v. *Holmes Estate*, 326 U. S. 480. In that case the decedent set up three trusts in January 1935, one for each of his three sons, aged 22, 19, and 14, respectively, naming himself as trustee. The period of the trusts was to be 15 years, but, under certain conditions, might continue for a longer term. The income in each trust was subject to the discretionary power of accumulation by the trustee, and if not accumulated it was to be distributed to the beneficiary periodically. The trustee was given the power to apply each beneficiary's share of corpus for his maintenance, comfort, welfare, or happiness. Various provisions for disposition over were made to provide for contingencies resulting from the death of beneficiaries during the continuance of the trusts. Upon termination of the trusts the corpus remaining was to be distributed to the respective beneficiaries. While the grantor retained for himself, during his lifetime, the power to terminate any or all of the trusts and distribute the corpus and accumulated income to the beneficiaries then entitled to receive it, he retained no power to revest in himself or his estate any portion of the corpus or income. The Court held that the power of termination retained by the grantor was sufficient to make the transfer includible in his gross estate, under section 811 (d) (2) of the Internal Revenue Code. The principal contention made against the inclusion of the transfer in the gross estate was that the effect of the various provisions was to reserve to the grantor only a power to accelerate the time of enjoyment of the beneficial interests created by the trust; that such were vested interests; and that no power was reserved to vest them or any of them in the donor or his estate or to

change or alter them or the terms of the gift in any manner other than by mere acceleration of enjoyment. In rejecting the contention, the Court said:

It seems obvious that one who has the power to terminate contingencies upon which the right of enjoyment is staked, so as to make certain that a beneficiary will have it who may never come into it if the power is not exercised, has power which affects not only the time of enjoyment but also the person or persons who may enjoy the donation. More therefore is involved than mere acceleration of the time of enjoyment. The very right of enjoyment is affected, the difference dependent upon the grantor's power being between present substantial benefit and the mere prospect or possibility, even the probability, that one may have it at some uncertain future time or perhaps not at all. A donor who keeps so strong a hold over the actual and immediate enjoyment of what he puts beyond his own power to retake has not divested himself of that degree of control which § 811 (d) (2) requires in order to avoid the tax.

Although there are factual differences between the instant case and the *Holmes* case and the latter may in some respects appear stronger for the respondent than the instant case, the factor which appears to have been determinative in the *Holmes* case is likewise present here, namely, the power to terminate contingencies upon which the right of enjoyment depends so as to make certain that a beneficiary will have it who may never come into it if the power is not exercised.

Under the trust agreement in controversy, the three children-trustors were entitled to receive the remainder of the transfer involved therein upon the decedent's death only upon the condition that they survived her. By the power to revoke the decedent could have terminated that contingency respecting survivorship and made certain that the children-trustors, instead of others, would have the immediate, full, complete, and absolute ownership and enjoyment of the transfer in controversy. The retention of that power by the decedent was sufficient to bring the instant case within the rule of the *Holmes* case and require the inclusion of the controverted transfer in the decedent's gross estate, under the provisions of section 811 (d) (2). Also see *Estate of Charles M. Thorp, supra,* where it was held that the donor's retention of a power to revoke in conjunction with the income beneficiaries of the trust and cut off the remainder interests, so as to vest in the income beneficiaries property which they would not otherwise acquire, rendered such property includible in the donor's gross estate under the provisions of section 811 (d) (2) of the code.

Issue II.—*Value of Transferred Corporate Stocks.*

FINDINGS OF FACT.

Dry Goods was organized as a California corporation by B. F. Coulter in 1892. Association was also organized as a California cor-

poration by him in 1905. On March 22, 1942, the outstanding shares of stock of the two corporations were owned as follows:

| Stockholder | Dry Goods | Association |
|---|---|---|
| | Shares | Shares |
| Title Insurance & Trust Co | 999 | 999¾ |
| Frances C. McReynolds | 1,999 | 1,998⅓ |
| R. P. McReynolds | 1 | 1 |
| Charles I. Baker | 1 | |
| Milton C. Barbour | | 1 |
| Total | 3,000 | 3,000 |

The shares of stock of the corporations were not listed on any exchange.

The bylaws of each corporation provided that the shares thereof would not be sold, transferred, or assigned unless the stockholder first offered to sell them to other stockholders upon the same terms as he proposed to sell them to an outsider. Each of the other stockholders had 20 days thereafter within which to purchase such shares upon the terms prescribed, failing which the proposed sale could be executed. Each share certificate issued by the corporations contained specific reference to the bylaws containing the foregoing provisions.

Dry Goods operates a dry goods and department store business in Los Angeles. The business was started in the 1870's and in 1917 was conducted at 2d Street and Broadway which is in downtown Los Angeles. In 1917 the business was moved to 7th and Olive Streets, also in the downtown section. It remained at the latter location until September 1938, when it was moved to 5600 Wilshire Boulevard, which is about four miles from downtown Los Angeles and is in an active business section known as the Miracle Mile. The business has been conducted at the Wilshire Boulevard location since 1938. The merchandising practices followed by Dry Goods have built for it an excellent reputation for selling good merchandise at a fair price.

Association is largely a real estate holding company. At the time of its formation in 1905 B. F. Coulter transferred to it various parcels of real estate which he owned in Los Angeles. Some of these were income-producing while others were vacant. The property occupied by Dry Goods at 7th and Olive Streets was occupied under a lease from the owner, 7th Street Corporation, the stockholders of which were separate and distinct from Dry Goods and Association and their stockholders. The rental was $13,500 a month. In 1937 Association acquired the land at 5600 Wilshire Boulevard and thereafter during that year and 1938 erected a building on it, which, since September 1938, has been leased to and occupied by Dry Goods. For use in acquiring the land and in constructing the building, Association

borrowed $500,000 from an individual named Harry Evans, after an insurance company and a bank had declined to make a loan on the security offered and for as long a term as desired. The loan from Evans was secured by a first mortgage on the land and building at 5600 Wilshire Boulevard, bore interest at the rate of 4½ per cent per annum, and required an annual sinking fund payment of $25,000 a year. To complete the building Association borrowed additional sums aggregating $446,014.80 from Dry Goods, evidenced by a demand note bearing interest at the rate of 4 per cent per annum, payable monthly, and secured by a second mortgage on the premises.

The land upon which Association's building was erected and that adjacent thereto used for parking consisted of several lots of an undisclosed total square footage, some of which had frontage on Ridgeley Drive. The land was acquired at a total cost of approximately $261,-000. The building is a 4-story, reenforced concrete, fireproof structure, with penthouse and basement. It is 144 feet wide, with a depth of 176 feet on one side and 144 feet on the other, and contains approximately 125,000 square feet, of which about 85,000 square feet are rentable. The building was designed and constructed especially for department store uses. The cost of the building when completed, about October 1938, was approximately $650,000.

The lease under which Dry Goods has occupied the property was entered into between it and Association under date of September 1, 1938, and was for the term beginning on that date and ending on September 30, 1952. As rental, Dry Goods was to pay all taxes levied upon the premises, plus a "minimum rental" of $50,126 for the period September 1, 1938, to July 31, 1939, and of $51,791 for the fiscal year ending July 31, 1940, and of an amount in each fiscal year thereafter which would be $1,765 less than that paid in the preceding year, so that the "minimum rental" of $30,610 would be payable for the fiscal year ending July 31, 1952. In addition, Dry Goods was to pay a "maximum rental" of $41,000, such amount to be paid only if earned by Dry Goods, but if unpaid in any year it was to be accumulated and added to the following year's "maximum rental." A supplement to the lease was executed on September 8, 1941, to include an additional parcel of land and to grant to Dry Goods an option to extend the lease for a period of 15 years from September 30, 1952, at an annual rental during the extension of 3 per cent of Dry Goods' annual gross sales, with a minimum of $25,000 a year. On November 7, 1941, the lease was further modified by the parties so as to provide that the "maximum rental" in any year should be an amount equal to the net income of Dry Goods, or $41,000, whichever was less, with no carry-over to succeeding years.

The following is a statement of Association's net income or loss and the dividends paid for the indicated fiscal years ended July 31:

| Year | Net income or (loss) | Dividends paid | Year | Net income or (loss) | Dividends paid |
|------|----------------------|----------------|------|----------------------|----------------|
| 1932 | $33,654.68 | None | 1938 | (5,525.72) | $12,500 |
| 1933 | 1,267.98 | $40,000 | 1939 | 2,017.97 | None |
| 1934 | 13,272.47 | 15,000 | 1940 | 27,829.53 | 30,000 |
| 1935 | (534.48) | 15,000 | 1941 | 59,872.92 | 30,000 |
| 1936 | 9,596.46 | 15,000 | 1942 | *4,487.51 | 33,000 |
| 1937 | 13,101.01 | 12,500 | | | |

* After deduction of losses totaling $51,518 on the sale of real estate and corporate stocks.

On March 22, 1942, the date of the death of Lelia E. Coulter, Association's assets consisted of the following items, which had the fair market values indicated:

*Fair market value*

| | |
|---|---|
| U. S. Government bonds | $10,940.00 |
| Other securities | 83,662.00 |
| Accounts receivable | 2,500.00 |
| Land and building, 5,600 Wilshire Blvd | 690,000.00 |
| Other real estate | 320,265.60 |
| Total | 1,107,367.60 |

On March 22, 1942, the real estate market in Los Angeles was in a confused condition. Association's original acquisition of frontage on Wilshire Boulevard was at a cost of about $1,300 per front foot. On December 30, 1942, a vacant corner lot on the same side of Wilshire as Asssociation's property, but about two blocks farther out from the business area, and admittedly a less desirable location, sold for about $402 per front foot. Some of Association's frontage on Wilshire Boulevard was acquired in 1937 at costs of $200 and $236 per front foot. So far as disclosed, there were no sales in the vicinity on or about March 22, 1942, of properties similar or comparable to Association's improved property. Nor was there any similar property in the vicinity that was being occupied under lease at that time.

Following the Japanese attack on Pearl Harbor, the securities markets experienced a substantial decline, and to March 22, 1942, the average price of typical high grade common stocks had declined to near the lowest point in the preceding seven years.

The liabilities of Association totaled $785,060.95, of which $312,500 represented the unpaid balance of the first mortgage and $422,014.82 the unpaid balance of the second mortgage. The net value of the assets of Association on March 22, 1942, was $322,306.65, or $107.44 per share if prorated equally among the 3,000 outstanding shares of its stock.

In determining the deficiency the respondent determined that the net asset value of Association's stock on March 22, 1942, was $163.88 per share and that the fair market value of the 999⅔ shares held by the trust was $150 per share.

On March 22, 1942, the fair market value of the 999⅔ shares of stock in Association held by the trust was $90 per share.

The decedent's husband, Frank M. Coulter, was the son of B. F. Coulter by the latter's first wife. After the first wife's death, B. F. Coulter married Alice W. Coulter. To the latter marriage there was born a daughter, Frances Coulter, who married R. P. McReynolds.

In 1927 Alice Coultér and Frances McReynolds owned two-thirds of the stock in Dry Goods and in Association. On October 24, 1927, they entered into a contract with McReynolds which recited that they deemed it for the best interests of the corporations that he should remain in charge of the properties and affairs of the corporations as executive manager so long as he was willing, and mentally and physically able to serve. In consideration of his withdrawal of his proposal to resign and his promise to continue to devote his best efforts to the management of the corporations in the manner in which he had been accustomed to do for several years past, they agreed as follows:

(1) That during their respective lives they would not sell their stock or part with its voting power without the consent of McReynolds.

(2) That provision would be made in their respective wills appointing the survivor of them, together with McReynolds, as trustee of the stock, so that voting power would be controlled by the survivor or by McReynolds as trustee, if he should survive both of them "so long as he may be actively engaged in supervising or managing the affairs of said corporations, or either of them."

(3) That, so long as McReynolds was mentally and physically able to supervise and control the management of the business, and so long as it seemed to them for the best interests of the corporations to do so, they would cooperate to retain him as executive manager of both corporations, and then being of the belief that it was for the best interests of the corporations and their stockholders that he should remain in charge as theretofore, they would use their influence to the end that his compensation should be commensurate with the value of his services and not less than his then salary of $15,000 a year.

(4) That in event McReynolds' tenure of office should cease or his compensation be reduced through no fault of his own, he should be entitled to sufficient of the dividends upon their stock to bring his annual income to $12,500, to which obligation their stock was to be deemed pledged as security.

(5)  That in event of the sale of their stock or upon liquidation of the corporations McReynolds was to receive 15 per cent of the net proceeds received by them from their stock.

On March 1, 1935, the foregoing contract was amended by the three parties by an agreement reciting that it was inadvisable, if not impossible, to continue payment to McReynolds of the compensation provided for in the contract of October 24, 1927.  By the amendment he was granted the privilege of continuing as manager of the corporations at such compensation as the parties might deem commensurate with the value of his services and the ability of the corporations to pay, or of continuing in charge and delegating a part of his supervisory duties, or of retiring entirely from the active management.  The amendment expressly reaffirmed the provisions of the original contract regarding "the trusteeship of the stock and reservation of voting power to Dr. McReynolds in the event of the death of either or both of the undersigned until he arrives at the age of seventy-five years," as well as all other matters unaffected by the amendment.

McReynolds was 70 years of age when the decedent herein died.  Alice Coulter died in 1937 and Frances C. McReynolds died on August 12, 1942, at the age of 61.  Both left wills placing in trust two-thirds of the stock of both corporations and vesting the voting rights thereto in McReynolds for his lifetime.  McReynolds was executor of the estate of Frances C. McReynolds.  On February 1, 1943, he filed a creditor's claim against the estate upon the above mentioned contract, alleging that all parties thereto had complied with all of its terms, that he was receiving a salary as manager of the corporations of $14,169 per annum and was continuing in such capacity at a like salary, and that the contract as amended was binding upon the representatives and heirs of Frances C. McReynolds and was an allowable claim against her estate.  The claim was allowed by the probate court.  On final distribution of the estate the stock was distributed to McReynolds, as trustee, and he is still acting as trustee.

McReynolds is and has been a practicing physician and surgeon, as well as president and general manager of both corporations.  He has maintained a medical office in downtown Los Angeles for a great many years.  He is at the store of Dry Goods each day from about 8:30 to 10:30 a. m. and from about 2:30 until 4 p. m.  The remainder of his time is devoted to his medical practice.  He directs the policies of the company.

The following is a statement of Dry Goods' merchandising sales, merchandising income (or loss), nonrecurring gain (or loss) on sales of securities, etc., dividends or interest from securities, the total net

income (or loss), and the dividends paid for the indicated fiscal years ended July 31:

| Year | Merchandising sales | Merchandising net income (or loss) | Gain (or loss) on sales of securities, etc. | Dividends and interest | Net income (or loss) | Dividends paid |
|---|---|---|---|---|---|---|
| 1932 | $1,853,306.49 | $(245,694.48) | $ 2,409.26 | $64,959.48 | ($178,325.74) | None |
| 1933 | 1,424,851.66 | (225,951.16) | (1,102.58) | 65,684.15 | (161,369.59) | $20,000 |
| 1934 | 1,424,976.71 | (174,789.04) | (155.16) | 58,014.18 | (116,619.40) | 37,500 |
| 1935 | 1,509,115.50 | (86,664.78) | (5,956.30) | 52,691.09 | (28,242.39) | 37,500 |
| 1936 | 1,603,870.89 | (50,199.19) | (535.63) | 38,893.63 | (11,841.17) | 37,500 |
| 1937 | 1,796,529.44 | (11,063.35) | ------------ | 30,550.04 | 19,486.75 | 40,000 |
| 1938 | 1,866,036.70 | (38,674.36) | ------------ | 33,921.93 | (4,752.43) | 40,000 |
| 1939 | 1,655,650.86 | (8,152.16) | ------------ | 34,888.23 | 26,736.07 | 40,000 |
| 1940 | 1,468,046.07 | (20,368.92) | ------------ | 31,259.06 | 10,890.14 | None |
| 1941 | 1,569,538.31 | (21,065.02) | ------------ | 30,900.33 | 9,835.31 | None |
| 1942 | 1,748,678.78 | 38,450.03 | (51,524.07) | 40,074.45 | 27,000.41 | None |

From the first of 1940 and continuing thereafter there was a tremendous influx of war workers to Los Angeles, so that the demand for merchandise in the local market was greater than the supply.

The balance sheets of Dry Goods as of July 31 of the indicated years show the following:

| | 1932 | 1937 | 1941 | 1942 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash | $153,432.67 | $289,031.38 | $33,947.62 | $98,473.55 |
| U. S. Government bonds | 1,032,320.97 | 584,070.45 | 311,625.00 | 313,139.80 |
| Marketable securities | 145,527.50 | 139,249.55 | 111,073.59 | 28,842.06 |
| Accounts and notes receivable | 108,263.97 | 154,199.74 | 581,623.34 | 599,339.09 |
| Inventories | 585,930.78 | 391,851.87 | 381,062.73 | 550,772.50 |
| Total | 2,025,475.89 | 1,558,402.99 | 1,419,332.28 | 1,590,567.00 |
| Furniture, fixtures and real estate (less depreciation) | 25,999.74 | 35,123.01 | 149,061.58 | 135,358.02 |
| Deferred assets | 3,493.31 | 6,531.50 | 23,577.99 | 29,683.42 |
| Total | 2,054,968.94 | 1,600,057.50 | 1,591,971.85 | 1,755,608.44 |
| **LIABILITIES AND CAPITAL** | | | | |
| Current liabilities | 49,203.42 | 59,777.73 | 92,399.00 | 228,426.57 |
| Capital | 300,000.00 | 300,000.00 | 300,000.00 | 300,000.00 |
| Surplus | 1,705,765.52 | 1,240,279.77 | 1,199,572.85 | 1,227,181.87 |
| Total | 2,054,968.94 | 1,600,057.50 | 1,591,971.85 | 1,755,608.44 |

On March 22, 1942, loans on the highest grade of first mortgages on major buildings in Los Angeles were being made at an interest rate of 4½ to 5 per cent per annum. A fair grade of first mortgage loans on Los Angeles business property was selling on that date at a rate of 6½ to 7 per cent per annum. More speculative mortgage loans were selling to produce a current yield up to 13 per cent.

The net worth of the assets of Dry Goods on March 22, 1942, the date of the death of Lelia E. Coulter, was $1,345,981.21, or an amount

of $448.66 per share if prorated equally among the 3,000 shares of stock outstanding.

In determining the deficiency the respondent determined that the fair market value of the 999 shares of stock in Dry Goods held by the trust was $350 per share on March 22, 1942.

The fair market value of the said shares on that date was $275 per share.

### OPINION.

The ultimate question under this issue is the fair market value on March 22, 1942, of the 999⅔ shares of stock in Association and of the 999 shares of stock in Dry Goods held by the trust on that date. Subsidiary questions are the fair market value of Association's land and building on Wilshire Boulevard and the fair market value of the unpaid portion of Association's demand note secured by a second mortgage on the Wilshire Boulevard property and held by Dry Goods. The subsidiary questions are of significance only in ascertaining the asset value of the shares in the respective corporations. Respecting the Wilshire Boulevard property, the petitioner contends that its value was not in excess of $600,000 and that the value of Association's stock was $79.68 a share. The respondent contends that the value of the property was at least $850,000 and that the value of Association's stock was $150 a share. As to the unpaid portion of Association's note in the amount of $422,014.82, the petitioner contends that it had no greater value than 40 per cent of the face amount thereof and that the value of the stock in Dry Goods was $56.50 per share. The respondent's position is that the value of the note was equal to the face amount of the unpaid portion thereof and that the stock in Dry Goods had a value of at least $340 per share.

After carefully considering all of the evidence, including opinion testimony bearing on the respective questions and contentions, we have found as facts that on March 22, 1942, the fair market value of the Wilshire Boulevard property was $690,000, the value of Association's stock was $90 per share, the value of the unpaid portion of Association's note was approximately 60 per cent of face or $253,210, and the value of the stock in Dry Goods was $275 per share.

*Decision will be entered under Rule 50.*