ESTATE OF LEON HOLTZ, DECEASED, PROVIDENT TRADESMENS BANK AND TRUST COMPANY, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88457. Filed April 10, 1962.

*Harry T. Devine, Esq.,* for the petitioner.
*Frederick A. Levy, Esq.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in gift tax against petitioner for the taxable years 1953, 1954, and 1955 in the amounts of $61,130.90, $22.05, and $8,543.82, respectively.

The issue for decision is whether the transfers in trust of certain property, made by Leon Holtz on June 12, 1953, and January 18, 1955, were completed gifts for purposes of Federal gift tax. The deficiency for 1954 is the result of a technical adjustment dependent on the decision of the issue for 1953.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

Provident Tradesmens Bank and Trust Company is the surviving executor under the will of Leon Holtz (hereinafter referred to as Leon or settlor), who died August 18, 1955. It filed gift tax returns for the calendar years 1953–1955 on behalf of Leon with the district director of internal revenue, Philadelphia, Pennsylvania.

Sometime in late 1952 or early 1953, Leon discussed creating a trust with a trust officer of Land Title Bank and Trust Company, now Provident Tradesmens Bank and Trust Company. The trust principal was to consist primarily of a number of small mortgages having a value of between $300,000 and $400,000. After being apprised of the charge the bank would make for handling the trust, Leon authorized the trust officer to have an attorney prepare a deed of trust which, according to the testimony of the trust officer, would provide that "he [Leon] would receive all of the [trust] income as long as he lived, and that he [Leon] would have the right to use principal, as he found necessary." A deed of trust was prepared pursuant to Leon's instructions with Leon as the settlor and the bank as sole trustee which was dated and executed by the parties on June 12, 1953. The deed of trust provided, in part, as follows:

### FIRST

Trustee shall keep the principal of this trust invested and shall distribute the net income therefrom and the principal thereof as follows:

A. During the lifetime of Settlor:

1. The income shall be paid to him or to his order, or upon his direction, shall be accumulated and added to the principal.

2. As much of the principal as Trustee may from time to time think desirable for the welfare, comfort and support of Settlor, or for his hospitalization or other emergency needs, shall be either paid to him or applied directly for his benefit by Trustee.

B. Upon the death of Settlor, if Settlor's wife, FANNIE FLORENCE HOLTZ, survives him:

1. During Settlor's wife's lifetime:

a. The income shall be paid to her; and

b. As much of the principal as Trustee may from time to time think desirable for her welfare, comfort and support shall be either paid to her or else applied directly for her benefit by Trustee, which shall interpret this power liberally.

C. Upon Settlor's wife's death, if she survives Settlor, the then-remaining principal shall be paid over unto the Estate of Settlor's wife.

D. Upon Settlor's death, if he survives the death of his wife, the then-remaining principal shall be paid over unto the Estate of Settlor.

\*         \*         \*         \*         \*         \*         \*

### SEVENTH

A. Settlor or any other person, upon approval and acceptance by Trustee, may add to the principal of this trust by deed or will or otherwise.

B. It is hereby expressly declared by Settlor that he has been fully advised as to the legal affect of the execution of this Deed of Trust and informed as to the character and amount of the property hereby transferred and conveyed; and further that he has given consideration to the question whether the transfer herein contained shall be revocable or irrevocable and he hereby declares the same to be irrevocable and that it shall stand without any power in Settlor at any time to revoke, change or annul any of the provisions herein contained; except that Settlor and others may hereafter bring other properties within the operation of this Deed of Trust.

Execution of the deed of trust took place at Leon's home. Prior to affixing his signature to the deed, Leon asked the attorney, who prepared it, and the trust officer above mentioned whether he would have "enough money," and the trust officer replied that "it [the trust] provides for the payment of all income to you and also you can have money out of the principal." The trust officer assured Leon that the bank "would be liberal in giving him [Leon] money out of the corpus." Leon inquired as to whether he could have money from the trust to purchase a new car, and the trust officer said he could. Leon's wife, Fannie, signed the deed of trust as one of the witnesses.

Pursuant to the deed of trust, on June 12, 1953, Leon transferred to the trustee property having a value of $384,117. This property consisted of over 200 mortgages, most of which had a value of less than

$2,000, which Leon had kept until that time in the cellar of his home. The mortgages and the records pertaining thereto were in a state of utter confusion. Leon had made a great many mistakes in billing the mortgagors, he had failed to record some of the payments of principal, he had not kept accurate records of the tax receipts, he had thrown out some of the fire insurance policies, and, in some cases, the envelopes in which the mortgages had been sent from the title companies had not been opened. On January 18, 1955, Leon transferred an additional $50,000 in cash to the trustee to be held under the terms of the trust created June 12, 1953.

Leon was 80 years old at the time the above trust was created and Fannie was 61. Leon died in 1955 and Fannie died in 1958. In 1950 Leon and Fannie executed an agreement authorizing Leon, with Fannie's consent, to bind himself to contribute up to $475,000 to the Jewish National Fund of America and the National Committee for Labor Israel, Inc., for the purpose of constructing a trade school in Israel. The agreement also provided in substance that Leon should pay Fannie $50,000, that he should execute a will under which she would receive one-half of his estate if she survived him, and that he would not transfer any of his property, except the amount first stated above, without her consent. Leon made cash gifts to Fannie in the amounts of $29,695.28, $31,749.08, and $59,266.08 during the years 1950, 1951, and 1952, respectively.

Leon's contribution to the two organizations mentioned above was accomplished under agreements dated November 18, 1950, December 4, 1952, and March 26, 1953, which indicate that $300,000 in cash or property had been or was to be delivered to the organizations by the end of 1952 and the remaining $175,000 was placed in trust in March 1953 to pay the income to Leon and Fannie for life and then to be distributed to the two organizations.

Leon and Fannie filed joint income tax returns for the years 1951–1955, reporting net income or taxable income as follows:

| | |
|---|---|
| 1951 | $32,342.72 |
| 1952 | 36,504.71 |
| 1953 | 29,727.92 |
| 1954 | 23,709.72 |
| 1955 | 20,486.32 |

At some time before or after the trust of June 12, 1953, was established, Leon told the trust officer who had arranged for the trust that he thought he was worth about a million dollars.

The estate tax return for Leon, after an Internal Revenue Service audit wherein all adjustments were agreed to by the executors, shows an adjusted gross estate of $664,295.61, computed as follows:

| | | |
|---|---|---|
| Real estate | $5,700.00 | |
| Mortgages, notes, and cash | 59,673.57 | (cash, $33,863.99) |
| Jointly owned property | 5,632.29 | |
| Other property | 12,482.17 | |
| Transferred during decedent's life | 610,655.01 | |
| Total | 694,143.04 | |
| Funeral, executor, and administrative expenses | 10,489.88 | |
| Debts of decedent | 19,357.55 | |
| Total | 29,847.43 | |
| Adjusted gross estate | 664,295.61 | |

Leon left his surviving spouse a life estate in various properties which qualified for a marital deduction in the amount of $440,625.54.[1]

Sometime in 1954, Leon became confined to a nursing home and on five different occasions Fannie took his hospital bills, totaling $1,175.19, to the trustee for payment. There were not sufficient funds in the trust income account at those times to pay these bills and the bills were paid out of trust principal. These were the only amounts paid out of the trust principal to Leon or for his benefit.

OPINION.

The principal issue for decision is whether taxable gifts resulted from transfers to a trust established by Leon by deed of trust dated June 12, 1953, wherein Leon was the settlor and Land Title Bank and Trust Company, now Provident Tradesmens Bank and Trust Company, was the sole trustee. The trust instrument provided that the trustee should distribute the net income therefrom and the principal thereof as follows. During the lifetime of settlor the income should be paid to him, and as much of the principal as the trustee "may from time to time think desirable for the welfare, comfort and support of Settlor, or for his hospitalization or other emergency needs," should be paid to him or for his benefit. Upon the death of the settlor, if his wife survived him, the income of the trust was to be paid to her during her lifetime, and a similar provision was made for invasion of principal for her benefit during her lifetime. The trust was to terminate at the death of the survivor of settlor and his wife and the "then-remaining principal" was payable to the estate of the survivor.

On June 12, 1953, Leon transferred property having a value of $384,117 to the trust, and on January 18, 1955, he transferred an additional $50,000 in cash to the trust. Respondent determined that, as a result of these transfers, Leon made taxable gifts in 1953 in the amount of $263,277.63, and in 1955 in the amount of $35,570, computing the value of the taxable gifts by reducing the value of the property

---

[1] Stipulated, without explanation.

transferred in each instance by the actuarial value of Leon's life estate and reversionary interest in each transfer. Petitioner claims the transfers were not completed gifts and that no part of the value thereof was subject to gift tax.

At the trial of this proceeding respondent moved that the testimony of the trustee's agent concerning the circumstances surrounding the creation and execution of the trust be stricken from the record on the ground that the written trust instrument contained the entire agreement of the parties and that any parol evidence which varied, explained, or otherwise colored the terms of the instrument was inadmissible under the parol evidence rule. The motion was taken under advisement at the conclusion of the trial and the parties were asked to argue the motion on brief. Respondent did not mention his motion on brief and we assume he has abandoned it. However, it is well established in this Court that the parol evidence rule cannot be invoked by a third party, not a party to the written instrument involved, *Haverty Realty & Investment Co.*, 3 T.C. 161 (1944), and cases cited therein; *Sarah Helen Harrison*, 17 T.C. 1350 (1952); and, furthermore, one of the exceptions to the parol evidence rule is that parol evidence may be received not to contradict or vary the terms of the written contract but to explain how it is to be carried out. *American Crystal Sugar Co.* v. *Nicholas*, 124 F. 2d 477 (C.A. 10, 1941). Respondent's motion to strike the oral evidence is denied.

The Internal Revenue Codes of 1939 and 1954 provide no guideposts for determining when a gift becomes complete for gift tax purposes beyond the direction that "the tax shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible." [2] It is well settled in cases involving this issue, however, that the question whether a transfer in trust is a completed gift, and thus subject to gift tax, turns on whether the settlor has abandoned sufficient dominion and control over the property transferred to put it beyond recall. *Burnet* v. *Guggenheim*, 288 U.S. 280 (1933); *Estate of Sanford* v. *Commissioner*, 308 U.S. 39 (1939); *Smith* v. *Shaughnessy*, 318 U.S. 176 (1943).

Here we do not have a situation where the settlor either reserved the power in himself alone to modify, alter, or revoke the trust and thus revest the trust property in himself, as in *Burnet* v. *Guggenheim*, *supra*, or reserved the power to alter the disposition of the property or income therefrom in some way not beneficial to himself, as in *Estate of Sanford* v. *Commissioner*, *supra*, or reserved the power in conjunction with someone else to modify, alter, or revoke the trust,

---

[2] Section 2511(a), I.R.C. 1954, which is substantially the same as section 1000(b), I.R.C. 1939. The transfer in 1953 is governed by the 1939 Code, and the transfer in 1955 is governed by the 1954 Code.

as in *Camp* v. *Commissioner*, 195 F. 2d 999 (C.A. 1, 1952), reversing in part 15 T.C. 412 (1950). Leon reserved no rights in himself to change the disposition of the income or principal of the trust as fixed in the trust agreement. However, the trust agreement itself gave the trustee power to pay directly to Leon or for his benefit as much of the principal of the trust as the trustee thought desirable for Leon's welfare, comfort, and support, or for his hospitalization or other emergency needs. The question is whether this discretionary power placed in the trustee by the settlor under the terms of the trust agreement made the gifts of the remainder interests incomplete for gift tax purposes.

A number of cases decided by this and other courts have held that the placing of discretionary power in the trustee to invade corpus makes the gift of corpus incomplete under certain circumstances. The rule of thumb generally accepted seems to be that if the trustee is free to exercise his unfettered discretion and there is nothing to impel or compel him to invade corpus, the settlor retains a mere expectancy which does not make the gift of corpus incomplete. *Herzog* v. *Commissioner*, 116 F. 2d 591 (C.A. 2, 1941), affirming 41 B.T.A. 509 (1940). But if the exercise of the trustee's discretion is governed by some external standard which a court may apply in compelling compliance with the conditions of the trust agreement, and the trustee's power to invade is unlimited, then the gift of corpus is incomplete, *Commissioner* v. *Irving Trust Co.*, 147 F. 2d 946 (C.A. 2, 1945), affirming 2 T.C. 1052 (1943), and this is true even though such words as "absolute" and "uncontrolled" are used in connection with the trustee's discretion, provided the external standards are clearly for the guidance of the trustee in exercising his discretion. *Estate of John J. Toeller*, 6 T.C. 832 (1946), affd. 165 F. 2d 665 (C.A. 7, 1948) ; *Estate of Lelia E. Coulter*, 7 T.C. 1280 (1946).

The theory behind this rule seems to be that by placing such standards for guidance of the trustee's discretion in the trust agreement itself, the settlor has not actually lost all dominion and control of the trust corpus or put it completely beyond recall because to ignore the implications and purpose for writing the standards into the invasion clause would be an abuse of discretion on the part of the trustee which the trustee would neither desire to do nor be likely to risk doing under State laws; see *Estate of Christianna K. Gramm*, 17 T.C. 1063 (1951) ; *Estate of John J. Toeller, supra;* or because by borrowing money and relegating his creditors to the trustee for satisfaction of their debts the settlor could have effective use of the corpus for his own benefit,[3] see *Alice Spaulding Paolozzi*, 23 T.C. 182 (1954) ; *Sarah*

---

[3] The rights of creditors to reach the income and/or principal of a discretionary trust for satisfaction of their claims against the settlor may not be the same in all States. Compare *Sarah Gilkey Vander Weele*, 27 T.C. 340 (1956), affd. 254 F. 2d 895 (C.A. 6, 1958), involving Michigan law, and *Alice Spaulding Paolozzi*, 23 T.C. 182 (1954), involving

*Gilkey Vander Weele*, 27 T.C. 340 (1956), affd. 254 F. 2d 895 (C.A. 6, 1958).

The rule of thumb appears to be a reasonable application of the general rule established in the *Guggenheim, Sanford,* and *Shaughnessy* cases because where there is a reasonable possibility that the entire corpus might be repaid to the settlor there can be no assurance that anyone else will receive anything in the form of a gift, and if the corpus should happen to be kept intact until the settlor's death, even though the transfer in trust was not subjected to a gift tax, the corpus of the trust will in all likelihood be subjected to the estate tax in the settlor's estate. See *Estate of John J. Toeller, supra; Estate of Lelia E. Coulter, supra.*

Applying the above principles to the facts under consideration here, we conclude that no part of or interest in the property transferred to the trust constituted a completed gift for gift tax purposes when transferred to the trust.

The form of the trust agreement indicates that the principal beneficiary of the income, and the principal if it became desirable for his welfare, comfort, support, or emergency needs, was the settlor. The first instructions to the trustee, as shown by the part of the deed of trust quoted in our Findings of Fact, were to distribute net income and principal to the settlor during his lifetime. Only upon the death of the settlor, and if she survived him, was any provision made for payment of either income or principal to the settlor's wife. And only upon the death of the survivor of settlor and his wife was any provision made for distribution of the "then-remaining principal." The trustee had the unfettered power to use all of the corpus for the benefit of settlor, if it thought that it was desirable for the welfare, comfort, or needs of the settlor. The words used were broad enough to cover about anything Leon might want or need. It is reasonable to assume that the trustee would invade corpus and that it would be required to do so by a court if the welfare, comfort, or needs of the settlor made it seem desirable. Otherwise, there would not have been much reason for including the paragraph giving the trustee power to invade principal. It was entirely possible that the entire corpus might be distributed during the settlor's lifetime and no one other than the settlor would receive any portion thereof. As long as that possibility was present, by reason of the language employed by the settlor, the settlor had not abandoned sufficient dominion and con-

---

Massachusetts law, with *Herzog* v. *Commissioner,* 116 F. 2d 591 (C.A. 2, 1941), affirming 41 B.T.A. 509 (1940), involving New York law. See also Restatement, Trusts, sec. 156(2). While we do not rely on this theory and hence are not called upon to interpret the Pennsylvania law, a cursory examination of the law of that State would indicate it would follow the rule in Michigan and Massachusetts that will not permit a settlor to place property in trust for his own benefit and keep it beyond the reach of creditors. See *Morton* v. *Morton,* 394 Pa. 402, 147 A. 2d 150 (1950) ; *In re Mogridge's Estate,* 342 Pa. 308, 20 A. 2d 307 (1941) ; *Hay* v. *Price,* 15 Pa. Dist. R. 144 (1905).

trol over the property transferred to make the gift consummate. *Estate of John J. Toeller, supra.*

In addition to the trust agreement itself, the evidence indicates that the settlor, who was 80 years of age when the trust was established, expressed concern over whether he would have available sufficient funds to meet his needs. He asked the trust officer whether he would have enough money to buy an automobile and the trust officer reassured him by telling him that the trust agreement provided for the payment of all income to him and that he could also have money out of the principal, and that the trustee would be liberal in giving him money out of the principal. While the term "liberal" is not defined, the above conversation indicates the understanding of the parties was that the trustee recognized that principal should be distributed at any time the settlor's needs reasonably justified it.

The evidence also indicates that one reason Leon established the trust was because he was having difficulty managing the property placed in the trust. The original property transferred to the trust consisted of approximately 200 small mortgages which had been kept in a metal container in Leon's basement, the records on which the trustee discovered to be very inaccurate and inadequate. It is probable that management of the trust property was more of a motivating factor for Leon's establishment of the trust than a desire to put what appears to have been a considerable part of his remaining property completely beyond his reach.

While the language used in the trust instruments and the surrounding circumstances involved in the *Vander Weele* and *Gramm* cases were a little different than the language used in this trust instrument and the circumstances here involved, we think they were close enough to compel the conclusion we reach here. We do not believe respondent's argument that because of Leon's wealth it was very unlikely that the trustee would ever be called upon to use much of the corpus is well founded. It appears from the evidence that when Leon established this trust he had given away most of his property.

*Decision will be entered for the petitioner.*