**MULLIKIN et al. v. MAGRUDER, United States Collector of Internal Revenue for District of Maryland.**

No. 5362.

Circuit Court of Appeals, Fourth Circuit.

May 16, 1945.

Harry N. Baetjer, of Baltimore, Md. (Enos S. Stockbridge, of Baltimore, Md., on the brief), for appellants.

Melva M. Graney, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., and Bernard J. Flynn, U. S. Atty., of Baltimore, Md., on the brief), for appellee.

Before SOPER, DOBIE and NORTH-COTT, Circuit Judges.

SOPER, Circuit Judge.

This suit was brought to secure a refund of estate taxes alleged to have been overpaid. Addison E. Mullikin and H. LeRoy Carter, executors of the estate of Merville H. Carter, who died in 1939, paid under protest a deficiency assessment for federal taxes based on the inclusion in the gross estate of the decedent of (1) certain promissory notes; (2) a credit belonging to the decedent on the books of a partnership consisting of himself, his son and his brother; and (3) the interest of the decedent in the partnership valued at $95,-768.10. Suit was brought on the theory that these three items had been improperly included in the gross estate. The claim as to the promissory note was decided in favor of the estate and the claim as to the credit on the books of the partnership was abandoned in the court below. Judgment was rendered for the executors in the sum of $2,110.79. This appeal is confined to the third item and is based on the finding that the interest of the decedent in the partnership was taxable as a part of the gross estate.

The decedent, Merville H. Carter, was the father of H. LeRoy Carter and the brother of Allan L. Carter. In 1896 Merville H. Carter and Allan L. Carter, together with Henry S. Dulaney, established a proprietary medicine business in the City of Baltimore under the name Resinol Chemical Company. The business was eminently successful with profits from 1918 to 1929, without deduction for salaries of the partners, averaging well over $100,000 a year and from 1929 to 1939 about $75,000 a year. Early in 1929 Dulaney died and his interest was acquired by the other part-ners, each of whom then owned a half interest in the partnership.

At the time of Dulaney's death the decedent was 72 years of age. A few years before he had married a second time. He had two sons by his first wife, one of whom was an invalid supported by his father, and the other, H. LeRoy Carter, about 47 years of age, was successfully engaged in business as president of a paving brick company. The decedent was possessed of a large personal fortune in addition to his interest in the Chemical Company, and after Dulaney's death he was inclined to lighten his business activities. Accordingly he entered into an agreement with his son LeRoy on April 5, 1929.

The agreement recited that the son had purchased an interest in the business of the Resinol Chemical Company for $25,000 and that the father had agreed to transfer to the son one-fourth of the father's interest in the company and to convey all his remaining interest therein to become effective upon his death. The agreement specifically provided that

"* * * the party of the first part (Merville H. Carter) grants, assigns, and conveys unto the party of the second part (H. LeRoy Carter)

"(1) one-fourth of all of the right, title and interest of the party of the first part in the partnership of Resinol Chemical Company, same to belong to the party of the second part absolutely; (2) all of the rest of the interest of the party of the first part in and to the partnership of Resinol Chemical Company, at the time of the death of the party of the first part, it being the intention of this section that, upon the death of the party of the first part, the party of the second part shall succeed to all the right, title and interest of the party of the first part in and to the Resinol Chemical Company.

"In the event that a corporation shall be formed to succeed to the business of Resinol Chemical Company, the parties of the first and second parts are to receive proportionate amounts of the stock of said corporation, equal to their respective interests in the partnership, and, upon the death of the party of the first part, the party of the second part shall succeed to all of the right, title, and interest in and to the stock owned by the party of the first part in the said corporation."

On the same day Merville H. Carter, Allan L. Carter and H. LeRoy Carter entered into a partnership agreement whereby Le-

Roy was made a partner in the business. The agreement provided that the parties shall engage as partners in the business of making and selling pharmaceutical specialties and that

"6. (b) The net profits or net loss shall be divided between the parties ·hereto in the following proportions:

| | |
|---|---|
| Allan L. Carter | ½ |
| Merville H. Carter | ⅜ |
| H. LeRoy Carter | ⅛ |

and the account of each shall be credited or debited, as the case may be, with his proportionate share thereof."

"7. That at the termination of the partnership, by reason of any cause, a full and accurate inventory shall be prepared and the assets, liabilities and income, both gross and net, shall be ascertained; that the debts of the partnership shall be discharged and all monies and other assets of the partnership then remaining shall be divided in specie between the parties, as follows:

| | |
|---|---|
| Allan L. Carter | ½ |
| Merville H. Carter | ⅜ |
| H. LeRoy Carter | ⅛ |

"8. That in the event of the death of the party of the second part, this partnership shall not determine nor be dissolved, but the party of the third part shall succeed to all of the right, title and interest of the party of the second part in and to the partnership, to hold one-half interest therein in his own name, the same to belong to him absolutely."

Thereafter H. LeRoy Carter became an active partner in the business and gradually withdrew from his other business activities. Sometime in 1937, while he and Allan L. Carter were going over the papers of the partnership, they discovered that the deed to the property where the partnership business was conducted ran only to Allan L. Carter and Merville H. Carter. The deed was shown to Allan L. Carter's attorney who advised that a new deed be prepared to include H. LeRoy Carter's name in the title. In the course of its preparation counsel asked the exact nature of LeRoy's interest and was referred to a copy of the agreement of April 5, 1929 between Merville H. Carter and H. LeRoy Carter, but for some reason the partnership agreement of April 5, 1929 between the three parties was not produced and its precise terms were not considered; and the deed was prepared solely from the attorney's legal construction of the April 5th agreement. In the habendum clause it was stated: "* * * the interest of said parties respectively in said partnership being as follows, namely: Allan L. Carter—one-half interest; Merville H. Carter—interest for his life in three-eighths thereof, said three-eighths interest passing to H. LeRoy Carter after the death of Merville H. Carter; H. LeRoy Carter—one-eighth interest."

During the conference over the new deed, Allan L. Carter's attorney suggested that for purposes of clarity there ought to be a new partnership agreement expressing the various interests of the parties as a result of the 1929 sale of Merville H. Carter's interest, and accordingly, a new agreement dated June 19, 1937 was prepared. Like the new deed the phraseology of this instrument was based solely on a construction of the 1929 agreement between Merville H. Carter and H. LeRoy Carter, since the 1929 partnership agreement was never produced. Indeed this new instrument purported only to show the change in the original partnership agreement entered into by Dulaney, Allan L. Carter and Merville H. Carter in 1896. A recital of this new instrument reads as follows: "Whereas, on or about April 5, 1929, said Merville H. Carter, * * * did sell and assign unto the said H. LeRoy Carter, all his interest in said partnership business, reserving, however, unto himself for his life a three-eighths interest in said business, such interest, however, to pass to the said H. LeRoy Carter immediately upon the death of the said Merville H. Carter;" and in the body of the instrument it was stated:

"Now, Therefore, This Agreement Witnesseth: That the interests of the undersigned in the business conducted by them under the firm name of Resinol Chemical Company are as follows, namely:

| | |
|---|---|
| Allan L. Carter | One-Half interest |
| Merville H. Carter | Life interest in three-eighths with remainder of said interest to H. LeRoy Carter |
| H. LeRoy Carter | One-eighth interest." |

The decedent was not present at the conference leading up to the preparation of the new documents and apparently did not know of them until their preparation was complete. They were taken to him and his attorney explained that the proposed part-

nership agreement transferred his entire interest to his son subject to the payment of three-eighths of the net profits of the partnership during his life and that this was the same as the provisions of the 1929 agreement, but the new instrument was deemed desirable to eliminate any ambiguity. The decedent stated that this was what he had always intended and executed the papers.

The controlling statute here is § 302 of the Revenue Act of 1926, Ch. 27, 44 Stat. 9, 26 U.S.C.A. Int.Rev.Acts, page 227, which provides:

"§ 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death;

\* \* \* \* \* \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer \* \* \* in contemplation of or intended to take effect in possession or enjoyment at or after his death, except in case of a bona fide sale for an adequate and full consideration in money or money's worth. \* \* \*

"(d) To the extent of any interest therein of which the decedent has at any time made a transfer, \* \* \* where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power \* \* \* to alter, amend, or revoke \* \* \*." [1]

The question at issue is whether the three-eighths share in the business transferred to the son, subject to the life interest of the father, was transferred by the father "to take effect in possession or enjoyment at or after his death". In view of the admitted facts it is not contended by the government that the transfer was made in contemplation of death; and it is not con-

tended by the taxpayer that it was made "for an adequate and full consideration in money or money's worth". Nor is it contended that the 1937 instruments conveyed anything more than those of 1929. Such a contention indeed would be fatal to the taxpayer's case because the Joint Resolution of Congress of March 3, 1931 changed the rule laid down in May v. Heiner, 281 U.S. 238, 244, 50 S.Ct. 286, 74 L.Ed. 828, 67 A. L.R. 1244, wherein it was held that a transfer of property in trust by a grantor, later deceased, under which the income was payable to grantor's husband for life and then to grantor for life with remainder over to her children, was not a transfer of the corpus of the trust property to take effect in possession or enjoyment at or after death, but was immediately effective. Since the passage of the Joint Resolution, however, the value of property transferred by a grantor in which the grantor retains possession for life has been includible in the value of the gross estate subject to taxation. The taxpayer concedes that the 1937 agreements were merely confirmatory of the 1929 agreements and served only to express more clearly the intention of the parties in the earlier year.

Various theories are advanced by the parties as to the proper construction of the 1929 agreements. The government contends, first, that the interest transferred by the decedent in that year was one not taking effect until his death because he retained legal title to and domination and control over the property as well as possession and enjoyment thereof until his death. It is pointed out that in the conveyance from father to son in 1929 it was provided that the transfer of the father's three-eighths interest was to become effective upon his death and in the partnership agreement of that year that the son was to succeed to that interest upon his father's death. This language, it is said, together with the provision that the decedent would bear a proportionate share of the partner-

---

[1] The first sentence of § 302(c) of this Act was amended by Joint Resolution of Congress of March 3, 1931, Ch. 454, 46 Stat. 1516, to read as follows: "(c) To the extent of any interest therein of which the decedent has at any time made a transfer, \* \* \* under which the transferor has retained for his life or for any period not ending before his death (1) the possession or \* \* \* (2) the right to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth."

In Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858, this amendment was held inapplicable to transfers made prior to March 3, 1931. Section 302 of the 1926 Act with further amendments is now found in 26 U.S.C.A. Int.Rev. Code, § 811.

ship losses during his life, indicated that he retained legal title to and present ownership of the three-eighths interest even after the conveyance of 1929.

█ The District Judge rejected this contention and held that the conveyance of 1929 created a vested title in the remaining three-eighths interest if the partnership continued until the father's death. With this construction we agree. The situation of the parties and the circumstances of the transfer point to the unambiguous intention of the decedent to make a present transfer to his son. While the language of the 1929 agreement between the decedent and his son describes the intention of the parties as to what shall happen at the decedent's death, the specific verbs transferring the interest are all in the present tense and the plain tenor of the instrument is that a present transfer is being made. As pointed out by the taxpayer, the 1929 partnership agreement was necessary to give the son a voice in the management of the business (Ann.Code Md., 1939 Ed., Art. 73A, § 27), and hence the language of § 8 of that agreement is only descriptive of the effect of the grant contained in the agreement between father and son and does not indicate a transfer other than a present one. To this extent the 1937 agreements are confirmatory of the 1929 transfer.

█ We think, however, that the second ground upon which the government relies is tenable and requires the inclusion of the three-eighths interest in the taxable estate. It relates solely to the dissolution provision of the 1929 partnership agreement which, as we have seen, directed that if the partnership terminated for any reason, the net assets of the business should be divided in specie among the three partners in the following proportions—four-eighths to Allan L. Carter, three-eighths to Merville H. Carter and one-eighth to H. LeRoy Carter. Thereby the possibility of a reverter to Merville H. Carter of a full three-eighths interest in the property was created, so that until his death the possibility remained that an absolute title to this share of the business would revert to him, free from any limitation over to his son at his death. It was not until his death, the taxable event, that a complete transfer of dominion and control over the property was acquired by the son and his interest therein became absolute.

█ The taxpayer concedes that if this interpretation of paragraph 7 is correct, the three-eighths interest in the business was taxable to the father's estate notwithstanding the conveyance he made to his son. This is true because it was decided in Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368 that the refined technicalities of the law of property are not controlling in determining whether property transferred inter vivos is includible in the taxable estate of the transferor upon his death. The true test is whether under the terms of the conveyance full and complete dominion over the property by the transferee in a practical sense is established by the transferor's death. This view was well expressed by the District Judge in the following excerpt from his opinion [55 F.Supp. 895, 901]: "Before the decision of the Supreme Court in Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368, it is probable that the question here presented would have been decided in favor of the taxpayers, but I agree with counsel for the Collector that the decision here must be controlled by that recent case, if it is applicable. Before the Hallock case, transfers inter vivos which created vested remainders in a grantee were not within the scope of section 302 of the Revenue Act of 1926, May v. Heiner, 281 U.S. 238, 50 S.Ct. 286, 74 L.Ed. 826, 67 A.L.R. 1244; while transfers of merely contingent remainders were within the statute. Klein v. United States, 283 U.S. 231, 51 S.Ct. 398, 75 L.Ed. 996. There was, however, a third class of cases where the transfers according to property law constituted what were known as vested remainders subject to be divested by some condition subsequent. And in a number of cases prior to Helvering v. Hallock under varying conveyancing language the Supreme Court had held such transfers not within the statute. Helvering v. Hallock overruled this latter class of cases and held transfers subject to be so defeated by conditions subsequent within the statute. The cases are so fully reviewed in Helvering v. Hallock that it is quite unnecessary to attempt further discussion of them here."

█ It is of no moment that in 1929 it was not likely that the partnership in a business which had been so long and so successfully prosecuted would be voluntarily terminated. The possibility, nevertheless, persisted and there was also the chance that the partnership might be terminated by the death of Allan L. Carter since the partnership agreement provided only for its con-

tinuation in the event of the death of Merville H. Carter. In any event, the extent of the taxable estate of a decedent is not to be determined by estimating probabilities, as is shown in Fidelity-Phila. Trust Co. v. Rothensies, 65 S.Ct. 508, 510, where the Supreme Court said: "It is fruitless to speculate on the probabilities of the property being distributed under the contingent power of appointment. Indeed, such speculation is irrelevant to the measurement of estate tax liability. The application of this tax does not depend upon 'elusive and subtle casuistries.' Helvering v. Hallock, supra 309 U.S. [106], 118, 60 S.Ct. [444], 84 L.Ed. 604, 125 A.L.R. 1368. No more should the measure of the tax depend upon conjectures as to the propinquity or certainty of the decedent's reversionary interests. It is enough if he retains some contingent interest in the property until his death or thereafter, delaying until then the ripening of full dominion over the property by the beneficiaries." See, also, Commissioner v. Field's Estate, 65 S.Ct. 511.

The taxpayer endeavors to meet this aspect of the case by interpreting the partnership agreement of 1929 to mean that in the event of the termination of the agreement and the reversion of the three-eighths interest to the father, he would hold it for life impressed as to the remainder with a trust in favor of his son. We do not think that this interpretation is justified, for as the District Court said, there was no such express provision in the document and the court cannot supply one by construction. The two agreements, which must be read together to determine the intention of the decedent, expressly provided for the disposition of three-eighths interest in the business in three contingencies, to wit: (1) if the partnership should be in existence at the time of his death; (2) if the partnership should be succeeded by a corporation during his life and (3) if the partnership should be terminated during his life. In the first contingency it was provided that the son should succeed to the father's interest; in the second, that the respective interests of the father and son should continue as theretofore, and in the third, that the three-eighths interest should be distributed in its entirety to the father. We think that the exclusion of the son from all participation in this share of the business in the third contingency only has much significance and we cannot say that it was not deliberate or intentional. On the contrary, it seems to have been designed to meet the requirements of the situation, for the father was possessed of a large estate in addition to his interest in the Chemical Company and he might well have desired to retain the power to reconsider the final disposition of his estate in the event of a dissolution or a material change in the affairs of the company during his lifetime. The possibility that the reverter would actually occur requires the inclusion of the three-eighths interest in the taxable estate.

Affirmed.