ESTATE OF MAY L. VALENTINE, DECEASED, LESTER ARMOUR AND T. STANTON ARMOUR, FORMERLY CO-EXECUTORS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

THE MAY L. VALENTINE JUNE 6, 1932 TRUST, LESTER ARMOUR AND PATRICK A. VALENTINE, CO-TRUSTEES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3379, 3380–68.[1]   Filed February 9, 1970.

*William P. Sutter,* for the petitioners.
*Seymour I. Sherman,* for the respondent.

#### OPINION

WITHEY, *Judge:* The respondent, in docket No. 3379–68, determined an estate tax deficiency in the amount of $239,168.95 and addressed his notice to Estate of May L. Valentine, deceased, Lester Armour and T. Stanton Armour as coexecutors. In docket No. 3380–68, respondent determined a deficiency in the same amount against the May L. Valentine, June 6, 1932 Trust, Lester Armour and Patrick A.

---

[1] These dockets were consolidated for purposes of trial.

Valentine, cotrustees, as a transferee and beneficiary of the Estate of May L. Valentine, deceased, Lester Armour and T. Stanton Armour, coexecutors.

In these consolidated cases, the petitioners in docket No. 3379–68 contend that the notice of deficiency was invalidly issued and that this Court is without jurisdiction to decide the correctness of the deficiency involved. Petitioner in docket No. 3380–68 has conceded that if such deficiency or any part thereof is sustained, it is liable therefor as transferee of the estate.

The principal issues for our consideration are:

(1) Whether the proper amount to be included in the gross estate because of the reservation by the decedent of a right to periodic payments for her life out of the corpus of a trust created by her consists of (a) the entire value as of the date of her death of the trust corpus, as determined by respondent under sections 2036 and 2037,[2] I.R.C. 1954;[3] (b) the actuarial value as of such date of decedent's right to the foregoing payments, the basis upon which the estate tax return was prepared and filed by the executors; or (c) no amount, as presently contended by petitioners; and

(2) If petitioner in docket No. 3380–68 prevails herein, then whether the Court has jurisdiction in docket No. 3379–68.

The facts have been stipulated and are so found. The stipulation, with attached exhibits, is incorporated herein by this reference. Those facts necessary to an understanding of the case follow.

May L. Valentine, hereinafter called decedent, was born on September 7, 1869, and died on February 3, 1965, at the age of 95. At the time of her demise she was a resident of Chicago, Ill.

On March 22, 1965, Lester Armour and T. Stanton Armour were appointed coexecutors of her estate by the Circuit Court of Cook County, Ill. In that capacity they filed an estate tax return for her estate on May 3, 1966, and paid the tax shown as due thereon, i.e., $2,199,950.64.

On June 6, 1932, decedent, as grantor, and her sons, Philip D. Armour, Lester Armour, and Patrick A. Valentine, as trustees, executed a trust agreement creating the so-called Valentine Trust. The trust agreement provided in part as follows:

2. During the period of five (5) years from the date hereof the Trustees shall accumulate the balance of the net income and hold the same in a separate fund and invest the same and the income derived therefrom. From and after the expiration of said five-year period, the Trustees shall pay the balance of net income remaining after the payments mentioned in paragraph 1 hereof monthly

---

[2] Our resolution of this issue under sec. 2037 makes decision of issue 2 unnecessary.

[3] Unless otherwise mentioned, all references are to the Revenue Code of 1954, as amended.

to said PHILIP D. ARMOUR, LESTER ARMOUR, and PATRICK ANDERSON VALENTINE in equal shares.

3. The Trustees shall pay to the Grantor from the principal of the trust estate the sum of One Hundred and Fifty Thousand Dollars ($150,000) per annum in equal monthly installments so long as she shall live.

4. Upon the death of the Grantor, the Trustees, after setting aside an amount of principal sufficient in their judgment to provide for the said annuity for MARJORIE K. LESTER, if she shall be living, shall divide the remaining principal of the trust estate together with the separate fund mentioned in paragraph 2 hereof into three (3) equal shares and shall hold and dispose of said shares as hereinafter provided. The Trustees may in their discretion use a sufficient amount of principal of the trust estate to purchase an annuity for said MARJORIE K. LESTER from some insurance or other corporation authorized to issue annuities.

5. Upon the death of the Grantor, the Trustees shall transfer and pay over one (1) of said three equal shares to said PHILIP D. ARMOUR free from any trust. If said PHILIP D. ARMOUR shall die prior to the termination of this trust, the Trustees shall pay the shares of income and principal which he would have received if living to his lawful issue in equal portions *per stirpes*. If he shall die without lawful issue him surviving or if issue him surviving shall all die prior to the termination of this trust, then in either case the Trustees shall pay said shares of income and principal in equal shares to said LESTER ARMOUR and his heirs and said PATRICK ANDERSON VALENTINE and his heirs.

6. The Trustees shall transfer and pay over one (1) of said three equal shares to said LESTER ARMOUR free from any trust. If said LESTER ARMOUR shall die prior to the termination of this trust, the Trustees shall pay the shares of income and principal which he would have received if living to his lawful issue in equal portions *per stirpes*. If he shall die without lawful issue him surviving or if issue him surviving shall all die prior to the termination of this trust, then in either case the Trustees shall pay the said shares of income and principal in equal shares to said PHILIP D. ARMOUR and his heirs and said PATRICK ANDERSON VALENTINE and his heirs.

7. (a) The Trustees shall transfer and pay over one-half (½) of one of said three equal shares of the trust estate to said PATRICK ANDERSON VALENTINE free from any trust, or, if he shall not be living, then to his lawful issue in equal portions *per stirpes*. If he shall die without lawful issue him surviving or if issue him surviving shall all die prior to the termination of this trust, then in either case the Trustees shall pay said one-half in equal shares to said PHILIP D. ARMOUR and his heirs and said LESTER ARMOUR and his heirs.

(b) The Trustees shall continue to hold the remaining one-half (½) of one of said three equal shares of the trust estate for the benefit of said PATRICK ANDERSON VALENTINE and shall pay the entire net income thereof to him so long as he shall live; and upon his death shall transfer and pay over said one-half to such persons as he shall by will appoint, or, in default of such appointment, then to his lawful issue in equal portions *per stirpes*, or, if he shall fail to make such appointment and there shall be no such lawful issue then living, then in equal shares to said PHILLIP D. ARMOUR and his heirs and said LESTER ARMOUR and his heirs.

(c) If said PATRICK ANDERSON VALENTINE shall die in the lifetime of the Grantor, the Trustees shall pay his share of the income of the trust estate until the death of the Grantor to such persons as he shall by will appoint, or, in default of such appointment, then to his lawful issue in equal portions *per*

*stirpes,* or, if he shall fail to make such appointment and there shall be no such lawful issue then living, then in equal shares to said PHILIP D. ARMOUR and his heirs and said LESTER ARMOUR and his heirs.

\*          \*          \*          \*          \*          \*          \*

14. This trust may be modified or terminated by an instrument in writing signed by the Grantor and by Philip D. Armour, Lester Armour and Patrick Anderson Valentine, or by the Grantor and by the survivors or survivor of said Philip D. Armour, Lester Armour and Patrick Anderson Valentine, provided, however, that no such instrument of modification or termination shall transfer any property or interest therein to the Grantor. In the event of such termination the Trustees shall transfer and pay over all the property in the trust, or the property with respect to which the trust may be terminated in part, in accordance with the directions contained in the instrument of termination.

Subsequently, various documents modifying the trust agreement created on June 6, 1932, and releasing rights therein were executed by the decedent and/or the trustees during 1936, 1940, 1944, and 1950 as follows:

On March 23, 1936, decedent surrendered her power reserved in paragraph 14 of the original trust instrument to modify or terminate the trust agreement in conjunction with her sons. The instrument embodying this relinquishment read in part as follows:

1. Paragraph 14 of said trust agreement is hereby modified to read as follows:
"14. This trust may be modified or terminated by an instrument in writing signed by Philip D. Armour, Lester Armour and Patrick Anderson Valentine, or by the survivors of them. In the event of such termination the Trustees shall transfer and pay over the property with respect to which the trust is terminated in accordance with the directions contained in the instrument of termination."

2. Said Philip D. Armour, Lester Armour and Patrick Anderson Valentine, in consideration of the relinquishment by said May L. Valentine of her rights under the original provisions of said paragraph 14, hereby agree that in the exercise of their rights under said paragraph 14, as modified by this instrument, they will not terminate or modify, or take any action which will in any way affect, the right of said May L. Valentine under paragraph 3 of said trust agreement to receive payments from the principal of the trust estate as provided therein.

On January 31, 1940, the trustees, pursuant to a power to modify the trust agreement granted them by the trust instrument, modified paragraph 7 of the original trust agreement by the addition of subparagraphs (d) and (e), to which the first three subparagraphs were expressly made subject, and which read as follows:

(d) If under the provisions of subparagraphs (a) and (b) hereof said PATRICK ANDERSON VALENTINE'S son PATRICK A. VALENTINE, JR., shall become entitled to a share of principal hereunder, then the Trustees shall hold such share in trust for him and shall use the net income thereof, or such part of the net income as they shall determine, for the support, maintenance and benefit of said PATRICK A. VALENTINE, JR., so long as he shall live, and shall accumulate any unexpended income and add it to the principal of his share. The Trustees may also expend portions of the principal for his

benefit and may at any time in their discretion pay income directly to him or transfer and pay over part or all of the principal of his share to him. If there shall be any property in his share at the time of his death the Trustees shall transfer and pay over the same to his children then living, in equal shares, or if there shall be no children then living, then to his heirs.

(e) If under the provisions of subparagraph (c) here of said PATRICK A. VALENTINE, JR., shall become entitled to a share of income hereunder prior to the death of the Grantor, the Trustees shall, until the death of the Grantor, use such income for the support, maintenance and benefit of said PATRICK A. VALENTINE, JR.

On November 20, 1940, the trustees executed a further modification whereby the separate fund provided for in paragraph 2 of the original trust agreement was terminated and distributed in equal amounts to Philip D. Armour, Lester Armour, and Patrick Anderson Valentine.

On December 22, 1944, the trustees executed an instrument whereby they purported to release the power to modify or terminate the trust agreement conferred upon them by paragraph 14 of the original trust instrument.

By instrument dated June 13, 1950, Patrick A. Valentine purported to limit or reduce a certain power of appointment held by him pursuant to paragraph 7 of the original trust agreement.

Philip D. Armour, one of the trustees named in the instrument of June 6, 1932, and a beneficiary named therein, died on January 18, 1958. Thereafter the only trustees of the trust have been Lester Armour and Patrick A. Valentine.

At the date of decedent's death, the value of the trust corpus, excluding certain policies of insurance upon the life of the decedent owned by the trust, was in the amount of $462,711.41. The total face value of such policies was in the amount of $150,000 and the total of their cash surrender values at the date of decedent's death was in the amount of $148,179. As a result of decedent's death, the trust received $150,000 representing the face value of the policies, plus $1,185.54 in post mortem dividends, or a total of $151,185.54.

As of the date of decedent's death, the actuarial value of her right to receive future annual amounts conditioned on survivorship would exceed 5 percent of the remaining balance of the trust corpus for each of the next 5 years. Table VI of Actuarial Values for Estate and Gift Taxes (IRS publication No. 11) discloses that of 6,562 persons living at age 95, the following number are expected to still be surviving at various ages to age 100:

| Age | Persons still surviving | Percentage |
|---|---|---|
| 96 | 4, 173. 51 | 63. 6 |
| 97 | 2, 545. 81 | 38. 8 |
| 98 | 1, 483. 68 | 22. 6 |
| 99 | 822. 632 | 12. 54 |
| 100 | 431. 941 | 6. 58 |

From 1960 to 1964, inclusive, the total amounts paid to May L. Valentine (or the value of property distributed in kind) out of the corpus of the trust in each calendar year were as follows:

| Year | Amount |
|---|---|
| 1960 | $151,561.25 |
| 1961 | 149,616.14 |
| 1962 | 149,516.94 |
| 1963 | 148,602.67 |
| 1964 | 150,703.00 |
| Total | 750,000.00 |

One monthly payment or distribution was made in 1965 in the amount of $12,618.72. There is no indication that income was ever paid other than to those persons and in the manner specified in the trust instrument and amendments thereto.

On March 13, 1968, an order was entered by the Circuit Court of Cook County, Ill., discharging Lester Armour and T. Stanton Armour as executors and closing decedent's estate. On April 2, 1968, a letter to this effect was received in the office of the district director of internal revenue at Chicago, Ill., which read, in pertinent part, as follows:

Re: Estate of May L. Valentine
DEAR SIR:
You are hereby notified pursuant to Section 6903 of the Internal Revenue Code that the undersigned Executors of the Estate of May L. Valentine were discharged by the Circuit Court of Cook County, Probate Division, on March 13, 1968, and the estate was closed. Accordingly, their fiduciary capacity is terminated. A certified copy of the Order of Discharge is enclosed.

(S) Lester Armour
LESTER ARMOUR
(S) T. Stanton Armour
T. STANTON ARMOUR

On April 8, 1968, the district director of internal revenue at Chicago, Ill., mailed a letter to William P. Sutter, attorney for the May L. Valentine Estate, replying that his "letter furnishing this office the following information regarding the above-named trust" had been received, including information that he was no longer serving as trustee; and that the certified copy of the instruments attesting to such information had been received.

The statutory notice in docket No. 3379–68 was mailed on April 22, 1968, to Lester Armour and T. Stanton Armour at their respective last known addresses and was addressed as follows:

Estate of May L. Valentine, Deceased
Lester Armour, Co-executor
Room 1274, 111 West Monroe Street
Chicago, Illinois 60603
T. Stanton Armour, Co-executor
Room 1912, 231 South La Salle Street
Chicago, Illinois 60604

On or about June 13, 1968, pursuant to section 6213(b)(3) of the 1954 Code, the petitioner in docket No. 3380–68 made payment of the amount set forth as a deficiency in estate tax in the statutory notice of deficiency therein in the amount of $239,168.95. No interest has been paid thereon.

At no time prior to decedent's death was any modification or other change made with respect to the trust created on June 6, 1932, affecting the decedent's right to payments of trust corpus in accordance with paragraph 3 of the trust instrument of that date, and at no time did decedent waive or relinquish any of her rights under that paragraph.

*Issue 1. Inclusion of Transferred Property in Decedent's Gross Estate*

Respondent in docket No. 3380–68 determined that the entire value of the corpus of the trust as of the date of decedent's death is includable in her gross estate under section 2036 of the 1954 Code because she had retained for her life the enjoyment of the entire trust property, and also under section 2037 of the Code of 1954, as property of which the decedent made a transfer and with respect to which she retained a reversionary interest exceeding 5 percent of the value of such property. The pertinent provisions of these two sections of the Code are set forth in the margin.[4] In essence, respondent contends that under the trust agreement involved herein, decedent at all times pertinent

---

[4] SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

\* \* \* \* \* \* \*

(b) LIMITATION ON APPLICATION OF GENERAL RULE.—This section shall not apply to a transfer made before March 4, 1931; nor to a transfer made after March 3, 1931; and before June 7, 1932, unless the property transferred would have been includible in the decedent's gross estate by reason of the amendatory language of the joint resolution of March 3, 1931 (46 Stat. 1516).

SEC. 2037. TRANSFERS TAKING EFFECT AT DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time after September 7, 1916, made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, if—

(1) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent, and

(2) the decedent has retained a reversionary interest in the property (but in the case of a transfer made before October 8, 1949, only if such reversionary interest arose by the express terms of the instrument of transfer), and the value of such reversionary interest immediately before the death of the decedent exceeds 5 percent of the value of such property.

(b) SPECIAL RULES.—For purposes of this section, the term "reversionary interest" includes a possibility that property transferred by the decedent—

(1) may return to him or his estate, or

(2) may be subject to a power of disposition by him.

retained a continuing absolute right to the payment out of principal of the corpus until her death; that possession and enjoyment of the corpus of the trust by others was postponed until her death; and not until then would it be certain (1) as to who would be the persons entitled to such corpus, (2) as to how much corpus such persons would receive, or (3) whether in fact the entire trust corpus would have by then reverted to decedent.

For convenience of discussion we first consider whether under the trust in controversy the decedent had made a transfer of property with respect to which she retained a reversionary interest, and whether the value of such interest immediately before her death exceeded 5 percent of the value of "such property" within the purview of section 2037, *supra*.

Section 2037 was derived from sections 811(c)(1)(C), 811(c)(2), and 811(c)(3) of the 1939 Code and "corresponds to provisions of existing law insofar as they relate to transfers of property made prior to October 8, 1949." H. Rept. No. 1337, 83d Cong., 2d Sess., p. A314 (1954). Section 2037(b) defines the term "reversionary interest" to include a possibility that property transferred by the decedent (but not the income alone from such property), "may return to him or his estate" or "may be subject to a power of disposition by him." It further provides that the value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary or his delegate. Sec. 20.2037–1(c)(3) and (4), Estate Tax Regs.[5]

Under the Joint Resolution of March 3, 1931, ch. 454, 46 Stat. 1516, the Revenue Act of 1932, ch. 209, 47 Stat. 169, 278, and the Technical Changes Act of 1949, ch. 720, 63 Stat. 891, it became well-settled law that the amount to be included in the estate of the decedent-transferor who retained a reversionary interest within the terms of such provisions was not the value merely of the reversionary interest itself, but rather the value of the property subject to such interest.

---

[5] SEC. 20.2037–1. *Transfers taking effect at death—* * * *

     \*          \*          \*          \*          \*          \*

  (c) *Retention of reversionary interest.* * * *

     \*          \*          \*          \*          \*          \*

  (3) For purposes of this section, the value of the decedent's reversionary interest is computed as of the moment immediately before his death, without regard to whether or not the executor elects the alternate valuation method under section 2032 and without regard to the fact of the decedent's death. The value is ascertained in accordance with recognized valuation principles for determining the value for estate tax purposes of future or conditional interests in property. * * *

  (4) In order to determine whether or not the decedent retained a reversionary interest in transferred property of a value in excess of 5 percent, the value of the reversionary interest is compared with the value of the transferred property, including interests therein which are not dependent upon survivorship of the decedent. * * *

In filing the estate tax return for decedent's estate, the executors included in the computation of the gross estate, on account of her right to annual invasions of trust principal, only the actuarial value as of the date of her death of the decedent's reversionary interest, that is, $282,018.92.[6] Respondent determined that the entire value of the trust corpus ($613,896.95), immediately before the death of the settlor, is includable in the taxable estate and accordingly determined a deficiency of $239,168.95. In essence, respondent urges that section 2037, *supra*, requires inclusion not only of the actuarial value of the reversionary interest retained, but of the value of "all property" subject to that interest, viz, $613,896.95.

Petitioner, in its petition (docket No. 3380–68), alleges that the $282,018.92, reported on the estate tax return, represented the actuarial value of the decedent's right immediately before her death to receive $12,500 per month from principal of the trust corpus, and that the $282,018.92 was erroneously included in her estate tax because her right to this amount terminated with her demise, at which time she possessed no rights whatever in the trust. It is the present position of petitioners on brief that under the doctrine of *Becklenberg's Estate* v. *Commissioner*, 273 F. 2d 297 (C.A. 7, 1959), reversing 31 T.C. 402 (1958),[7] no amount was includable in decedent's gross estate under sections 2036 or 2037, both *supra*, and they seek as a refund the amount of $239,168.95 plus interest set forth as a deficiency in the statutory notice, plus the amount by which the estate tax liability would be reduced below that set forth in the estate tax return as filed in the event no part of the trust is held includable. Essentially, petitioners urge that decedent's right to receive $150,000 per annum from principal was not a reversionary interest within the intendment of section 2037, *supra*, and hence that nothing is required to be included in her gross estate under that section. Alternatively, petitioners further urge that if we hold that decedent retained such an interest in the trust then the maximum amount includable in her gross estate would be the actuarial value of her reversionary interest in the corpus, i.e., $282,018.92.

In the instant case there is no question that the Valentine Trust provided that the trustees were authorized to invade the trust corpus

---

[6] The taxable estate as disclosed by the estate tax return is $5,235,910.26, and the taxable estate as adjusted by respondent is $5,592,878.84. The estate tax shown on this return in the amount of $2,199,950.64 was paid on May 3, 1966, by the coexecutors. Respondent increased the value of the taxable estate by $331,878.03 by including therein the entire value of the Valentine Trust.

[7] In *Becklenberg's Estate* v. *Commissioner*, 273 F. 2d 297 (C.A. 7, 1959), the decedent-settlor retained a right to receive $10,000 annually by way of annuity or by distribution from the trust, and such rights were not limited to property transferred by her or the income therefrom. The Court of Appeals held that the Tax Court erred in including in decedent's gross estate the amount of corpus necessary to produce $10,000 of income for purposes of Federal estate tax. The Court of Appeals stated that decedent's right to receive the $10,000 was not limited to the property transferred by her or the income therefrom.

in a specified amount annually for the benefit of the settlor, and that the remainder interests could be obtained only by surviving the decedent. At the date of the settlor's death, the actuarial value of her right to receive future annual amounts conditioned on survivorship exceeded 5 percent of the remaining trust corpus for each of the next 5 years. In other words, at the time of the settlor's demise, the value of her reversionary interest far exceeded 5 percent of the value at such date of the trust corpus. Moreover, the chance or expectancy as of that date that she would survive for a sufficient period of time so that the entire remaining corpus of the trust would revert to her was also substantially in excess of 5 percent.[8]

With respect to respondent's determination under section 2037, *supra*, it appears beyond doubt that petitioners are concluded by the rule laid down in *Helvering* v. *Hallock*, 309 U.S. 106 (1940), as expanded and clarified by the decisions in *Fidelity Co.* v. *Rothensies*, 324 U.S. 108 (1945), and *Commissioner* v. *Estate of Field*, 324 U.S. 113 (1945), as well as decisions of lower courts, including this Court, in which retention of small or remote reversionary interests was held to require inclusion of the entire value of the property subject to the interest.

In *Fidelity Co.* v. *Rothensies*, *supra*, the decedent-settlor created a trust in 1928, reserving income to herself for life, and thereafter to her daughters for life, the corpus to go to the descendants of the daughters. She also retained the right to appoint corpus if both daughters died without issue, with a charitable remainder in the event of default of appointment. The Court held that the entire trust corpus (and not a lesser value after deduction of values of property interests or intervening estates) should be included in the gross estate of the decedent. In holding the value of the entire corpus includable, the Supreme Court, citing, *inter alia*, *Helvering* v. *Hallock*, *supra* (in which inclusion was based upon a reversionary interest), noted (p. 110):

While the matter of valuation was not argued and was not directly in issue in those cases, the inescapable consequence of the principles enunciated there * * * is to include *the entire corpus* in the gross estate of the decedent *under these circumstances.* [Emphasis supplied.]

And the Court further noted (pp. 111–112):

Tested by that standard, *the entire corpus of the trust* should have been included in the decedent's gross estate * * *. The ultimate disposition of all the trust property was suspended during the life of the decedent. Only at or after her death was it certain whether the property would be distributed under the power of appointment or as provided in the trust instrument. * * * The re-

---

[8] According to Table VI of Actuarial Values for Estate and Gift Taxes (IRS publication No. 11), out of 6,562 persons living at age 95, some 6.58 percent are expected to survive to age 100.

mainder interests of the descendants of the daughters were contingent upon their surviving both the decedent and the daughters and took effect in possession only after the death of the decedent. Thus until the moment of her death or until an undetermined time thereafter the decedent held a string or contingent power of appointment over the total corpus of the trust. The retention of such a string, which might have resulted in altering completely the plan contemplated by the trust instrument for the transmission of decedent's property, subjected the value of the entire corpus to estate tax liability. [Emphasis supplied.]

In the companion case of *Commissioner* v. *Estate of Field, supra*, where the precise "string" retained was a reversionary interest which was purely contingent upon the decedent's survival of certain named beneficiaries, the Court held squarely that since the property subject to the reversionary interest consisted of the entire corpus, the entire value thereof, and not merely that of the decedent's reversionary interest, was includable in the gross estate. In this connection, the Supreme Court said (p. 116) :

There is no basis evident for deducting the value of the corpus for the period of the life expectancies of the two measuring lives, as was done by the court below. The *estate tax is not based on the value of the reversionary interest of the decedent at the time of his death but on the value at the time of his death of the property to which that reversionary interest relates.* It makes no difference how vested may be the remainder interests in the corpus or how remote or uncertain may be the decedent's reversionary interest. *If the corpus does not shed the possibility of reversion until* at or after the decedent's *death, the value of the entire corpus* on the date of death is taxable. [Emphasis supplied.]

We have recognized the foregoing Supreme Court decisions as controlling the question of the value to be included in numerous opinions. *Eldredge* v. *Rothensies*, 150 F.2d 23 (C.A. 3, 1945), *Mullikin* v. *Magruder*, 149 F.2d 593 (C.A. 4, 1945) ; *Liebmann* v. *Hassett*, 148 F.2d 247 (C.A. 1, 1945) ; *Estate of Florence Althea Gibb*, 6 T.C. 1088 (1946), affirmed per curiam sub nom. *Hunter* v. *Commissioner*, 167 F.2d 633 (C.A. 2, 1948) ; *Estate of Thomas P. Leaman*, 5 T.C. 699, 702 (1945) ; *Estate of Martha W. Collins*, 5 T.C. 1276 (1945), affirmed per curiam 164 F.2d 276 (C.A. 2, 1947) ; *Estate of John C. Duncan*, 6 T.C. 84, 85 (1946) ; and *Estate of Lelia E. Coulter*, 7 T.C. 1280 (1946).

In *Estate of Lelia E. Coulter, supra*, the trust instrument contained a provision that the trustee in its absolute and uncontrolled discretion might pay principal to the settlor or apply principal for her benefit. Concluding that the entire trust corpus was includable in the computation of the gross estate, we said (p. 1289) :

By retaining the right to have corpus used for her benefit, the decedent postponed the complete and ultimate transfer of the property until her death. This was enough to bring the property within the provisions of section 811 (c) of the Internal Revenue Code. *Blunt* v. *Kelly*, 131 Fed. (2d) 632 ; *Margaret P. Gallois*, 4 T.C. 840 ; affd. 152 Fed. (2d) 81 ; *Estate of Ida Rosenwasser*, 5 T.C. 1043 ; *Estate of John J. Toeller, supra*. * * *

See also *Estate of Mary V. Cochran*, 9 T.C. 242, 247 (1947), affd. 173 F.2d 504 (C.A. 8, 1949), where we stated:

As we have heretofore pointed out, the incidence of the estate tax is upon the entire amount of property subject to the right of invasion, and not upon the actual or probable amount of the withdrawals. * * * [citing, *inter alia, Fidelity Co.* v. *Rothensies* and *Commissioner* v. *Estate of Field*, both *supra*].

It is significant that in dealing with reversionary interests under section 811(c) of the 1939 Code, the predecessor of section 2037, *supra*, the Senate proposed as legislative relief, the precise result which petitioners urge in the case at bar, i.e., that the amount includable in decedent's taxable estate be limited to the value of the reversionary interest. S. Rept. No. 831, 81st Cong., 1st Sess., 1949-2 C.B. 289, 294-295.[9] This recommendation was expressly rejected in H. Rept. No. 1412, 81st Cong., 1st Sess., 1949-2 C.B. 295, 297.[10]

Much has been said on this subject and we think we need not greatly increase the amount. Applying the foregoing principles to the facts of record, we believe that respondent's determination must be sustained. In the instant case, paragraph 3 of the trust provides that "The Trustees shall pay to the Grantor from the principal of the trust estate the sum of One Hundred and Fifty Thousand Dollars ($150,000) per annum in equal monthly installments so long as she shall live." Manifestly the decedent retained a continuing right to have the trustee invade the trust corpus in a specified and substantial amount per annum for her benefit, and, hence it could not be determined until her demise whether any of the trust corpus would pass to the named re-

---

[9] "8. *Reverters under the estate tax.*

   *      *      *      *      *      *      *

Section 8, which your committee has added to the House bill, further amends section 811(c) * * * to provide that the amount of the transferred property to be included in the gross estate shall not exceed the actuarial value of the decedent's reversionary interest immediately before his death. It applies only in case the property transferred by the decedent would not be includible * * * except by reason of the fact that he retained a reversionary interest in the property. The term "reversionary interest" is defined so as to include both a possibility that the transferred property or a portion thereof may return to the decedent or his estate and a possibility that the transferred property or a portion thereof may pass under the exercise of a power by the decedent * * *"

[10] "The Senate amendments provide that if property transferred by the decedent would be includible in his gross estate only by reason of the retention by him of a reversionary interest in the property, the amount to be included shall not exceed the value of such interest immediately before his death. While the Senate amendments apply to transfers whenever made, the conference amendments provide one rule for transfers made prior to October 8, 1949, and a different rule for subsequent transfers.

"With respect to the transfer *before October 8, 1949,* of an interest intended to take effect in possession or enjoyment at or after the decedent's death, the conference amendments *retain the present rule that the entire value of the interest is included in the decedent's gross estate,* but restricts the application of such rule to cases in which the decedent expressly retained a reversionary interest having a value immediately before the decedent's death in excess of 5 percent of the value of the transferred property. Where the reversionary interest has a value of not more than 5 percent of the value of the transferred property, or where it arises by operation of law (regardless of its value), it will not cause *the property* to be included in the decedent's gross estate to any extent." (Emphasis supplied.)

maindermen, i.e., those persons, from among her two sons and their issue, who survived her.

Respondent determined that at the date of decedent's death, the total trust corpus, including the cash value of policies of insurance upon her life owned by the trust, was in the amount of $613,896.95.[11] Thus, as of the date of her death, the entire trust corpus would revert to decedent in 4 years and 1 month. Decedent's right to the foregoing payments of corpus had a value as of the date of her death of $282,018.92, which very substantially exceeded 5 percent of the value of the trust corpus, $613,896.95 (equaling approximately 46 percent of such value). The probability at that time that she would survive an additional 4 years, in which event all but approximately $10,000 of the trust corpus would have reverted to her, was approximately 12.5 percent, or 1 chance in 8. Furthermore, the likelihood that she would survive an additional 5 years (in which case she would have survived by 11 months the entire reversion to her of that corpus), was in excess of 6.5 percent, or approximately 1 chance in 15.

It is clear from the foregoing that (1) possession or enjoyment of any of the trust corpus could be obtained only by surviving the decedent, and even then, only if and to the extent the decedent did not live long enough to recapture the entire corpus, and (2) decedent retained a reversionary interest in the property by the express terms of the instrument of transfer, the value of which, immediately before her death, exceeded (on any theory) 5 percent of the value of the "property transferred," namely, the trust corpus.

Also it is apparent that decedent's right to future annual payments exceeded 5 percent of the value of each such payment to the extent of sufficient payments to more than account for the entire date-of-death value of the corpus. Moreover, since under the terms of the trust provisions, current income was currently distributable to other persons, no such prospective income could delay the date at which the entire trust corpus would fully revest in the decedent. The burden is upon the petitioner to produce evidence that the value of the reversionary interest immediately before the death of the decedent cannot be determined or that its value is not in excess of 5 percent of the value of the corpus of the trust, and in the absence of such proof, we must assume that the value did exceed the necessary 5 percent. *Etate of Frank W. Thacher*, 20 T.C. 474, 483 (1953). From the record, we are satisfied that the decedent's right to successive invasions exceeded 5 percent with respect to future payments from principal to exhaust the entire date-of-death corpus. Viewing with realism and common sense, the age of the settlor (62) at the time

---

[11] Respondent, on brief however, refers to the total trust corpus at the date of decedent's death as $610,890.41. There is no explanation in the record for this difference.

the trust was created in June 1932, her life expectancy, and the magnitude of the successive invasions of principal relative to the corpus, we think that the decedent had retained a reversionary interest to invade corpus with virtually no limitation or ascertainable standard. See *Blunt* v. *Kelly*, 131 F. 2d 632, 635 (C.A. 3, 1942).

Although the settlor provided a fixed ceiling on the amount of the annual invasion of principal, the successive encroachments were nevertheless sufficient, we think, to postpone the complete and ultimate devolution of the trust corpus until her death and to characterize the transfer as one "intended to take effect in possession or enjoyment at or after * * * death." It is clear that the ultimate disposition or enjoyment of this trust was held in suspense until the moment of the settlor's death, and only at her demise was it certain whether the corpus would be distributed as provided in the trust agreement. *Fidelity Co.* v. *Rothensies, supra* at 510.

Accordingly, we hold that on June 6, 1932, decedent made a transfer in trust under the terms of which possession or enjoyment of the property could be obtained only by surviving the decedent, and under which she retained a reversionary interest by the express terms of the instrument of transfer, the value of which immediately before her death exceeded 5 percent of the value of the property transferred. Also we hold that as of the date of decedent's death, the possibility that she would survive for a sufficient period of time that the entire trust corpus would revert to her exceeded 5 percent.

Petitioner relies strongly on both decisions in *Bankers Trust Co.* v. *Higgins*, 136 F. 2d 477 (C.A. 2, 1943), reversing and remanding 29 F. Supp. 326 (S.D. N.Y. 1939), and 158 F. 2d 957 (C.A. 2, 1947), affirming 65 F. Supp. 836 (S.D. N.Y. 1946), and *Estate of Arthur Klauber*, 34 T.C. 968 (1960), for its contention that only the actuarial value of the decedent's retained right to a specified dollar amount of trust corpus per annum is includable in her gross estate by virtue of section 2037, *supra*, and not the entire value of the trust. We have carefully considered these cases and find them inapposite.

In *Bankers Trust Co.* v. *Higgins, supra*, the settlor, 74 years old, created a trust providing that the trust income should be divided equally between himself and his wife, and paid over to the survivor for life in the amount of $60,000 per annum, with remainder over upon the survivor's death, and that any difference in income should be taken from principal to the extent of $60,000 per year. The corpus at the time of the settlor's demise was worth about $1,300,000. When he died, aged 84 years, his expectancy, measured by the mortality tables was 3.63 years. The income from the fund during the 10 years that decedent lived after the trust had been set up had never been less than $60,000, so that the trustee had never drawn upon the prin-

cipal. The respondent determined that the entire fund should be included as part of the decedent's estate on the theory that *Helvering* v. *Hallock, supra,* and *Blunt* v. *Kelly, supra,* controlled. The Court of Appeals for the Second Circuit in the second *Bankers Trust Co.* v. *Higgins* case held that the possibility that resort to principal of the trust might be necessary, did not render the entire corpus of the trust subject to estate tax, and that "only the portion of the corpus of the trust that represented an estimated invasion of principal" to the extent of $20,278.77 should be included in decedent's gross estate as subject to estate taxes. The Court noted that the Commissioner argued that the decisions of the Supreme Court in *Fidelity Co.* v. *Rothensies, Commissioner* v. *Estate of Field,* both *supra;* and *Goldstone* v. *United States,* 325 U.S. 687 (1945), which involved situations that fell within the rule of *Helvering* v. *Hallock, supra,* showed that the rule adopted on the prior appeal in the first *Bankers Trust Co.* v. *Higgins* case had been rejected and, therefore, the Court should reverse its earlier judgment. Holding this contention unsound, the Court stated that each of these Supreme Court cases dealt with a possibility of reversion to the settlor which would affect the *entire* corpus of the fund, and hence, it was held that the *entire* principal should be included in the estate of the settlor irrespective that any reversion would occur. In effect, distinguishing these Supreme Court decisions from *Bankers Trust Co.* v. *Higgins, supra,* the Court of Appeals held that the trust provisions in controversy "from a common sense point of view only affects a small portion of the corpus." Thus, the Court said:

> The case is different where only a portion of the remainder * * * may be appraised with reasonable certainty under well known tables and reliable methods of calculation. Such was the situation in the case at bar. It cannot be said with any sense that a man 84 years old, having an expectation of life of but 3.63 years, had an interest in the corpus of this trust that would so exhaust it that it should be included in the estate taxable on his death merely because he had a right to have payments out of principal to the extent that it might not yield sufficient income to pay him a guaranteed minimum of $60,000 per year. The argument in support of such a contention is particularly fantastic when the decedent died January 26, 1933, and the estate had actually yielded an average income of nearly $67,000 during the ten years succeeding the creation of the trust on August 15, 1923 * * *. *In other words, it is sought to use a theory that is not only contrary to the demonstrated facts but from a common sense point of view only affects a small portion of the corpus.* [Emphasis added.]

In *Estate of Arthur Klauber, supra,* on June 4, 1932, the decedent-settlor created a trust and transferred certain cash securities to himself, his brother, and a bank as trustees under the trust. The trustees were authorized and directed to pay out of the principal of each trust created to those entitled to receive the income therefrom at such time, a sum not exceeding $2,000. The settlor died at age 70 and on the

date of his death, the fair market value of the securities making up the principal of the trust corpus of which he was transferor was $353,323.63. His reversionary interest consisted of a right to receive or dispose of $4,000 per year out of corpus. The payments actually made to his wife Ethel, pursuant to the trust during the life of decedent, totaled $43,018.59, and in no year did such payments exceed the sum of $4,000. Relying on *Bankers Trust Co.* v. *Higgins, supra,* we held that in *Klauber* the trust provision authorizing encroachment on principal only affected a small portion of the corpus and therefore "only the amount which it was reasonable to expect could be so reached" was includable in decedent's gross estate. Considering the value of the trust corpus ($353,323.63) at the date of his death and the small amount which the decedent could reach annually, we stated that it was "rather absurd to say until decedent's death it was uncertain whether *any* of the corpus would pass to the beneficiaries."

On first impression the situation in the instant case might appear to resemble that in *Bankers Trust Co.* v. *Higgins,* and *Klauber;* however, they are materially different on their facts and distinguishable in that where there is a limited power of invasion extending only to *part* of the corpus and a remote reversion in all of the corpus, such reversionary interests cannot be added together to create a taxable 5-percent reversion. Unlike *Bankers Trust Co.* v. *Higgins,* and *Klauber,* in the instant case the facts show that because of the age of the decedent when she created the trust involved with the proviso that she receive $150,000 per annum from principal, without regard to trust income, that she had retained the power by successive invasions of principal to virtually emasculate the corpus by the time of her demise. In short, the possibility of her invasions embraced the entire trust.

Finally, we reject petitioners' contention that no part of the trust corpus should have been included in decedent's gross estate under the holding in *Becklenberg's Estate* v. *Commissioner, supra,* on the ground that the "annuity concept" expressed therein is properly applicable to the Valentine Trust and hence that decedent had no taxable interest under either section 2036 or 2037. In *Becklenberg's Estate* the Court of Appeals held that the settlor-decedent had, in actuality, done nothing more than transfer property to the trustees in exchange for an annuity which terminated with her death. Here, the decedent made no purchase, exchange, or joint transaction with any third party giving rise to a general obligation to her in consideration for any payment by her. She merely made a gratuitous transfer in trust reserving to herself the right for her lifetime to periodic repayments of the corpus so transferred. That this constitutes a reversionary interest within the purview of section 2037, *supra,* and not an annuity arrangement is too evident to warrant further discussion. Certainly the facts of the instant

case are not within the rationale of *Becklenberg's Estate* v. *Commissioner, supra.*

In view of the foregoing, and the record as a whole, we must conclude that the entire value of the corpus of the trust as of the date of the decedent's death is includable in her gross estate under section 2037, *supra.* Because of petitioner's concession in docket No. 3380–68, it is liable as transferee for the deficiency determined herein.

*Decisions will be entered under Rule 50.*